**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

| | |
|---|---|
| ANDREW THOMAS,<br><br>          Petitioner,<br><br>v.<br><br>ROLAND COLSON, Warden, Riverbend<br>Maximum Security Institution,<br><br>          Respondent. | No. 12-cv-2333-JPM-tmp |

---

**ORDER DIRECTING CLERK TO CHANGE RESPONDENT**
**AND**
**ORDER GRANTING IN PART AND DENYING IN PART**
**PETITIONER'S MOTION FOR LEAVE TO CONDUCT DISCOVERY**

---

On November 26, 2012, Petitioner Andrew Thomas ("Petitioner" or "Thomas"), through counsel, filed a Motion for leave to conduct discovery. (Electronic Case Filing ("ECF") No. 25.)[1] Respondent Roland Colson[2] filed a Response on December 13, 2012. (ECF No. 26.) Thomas filed a Reply on December 21, 2012. (ECF No. 29.)

---

[1]     Unless otherwise noted, all ECF references are to filings contained in the docket for <u>Thomas v. Colson</u>, No. 12-cv-2333-JPM-tmp (W.D. Tenn. Apr. 27, 2012).

[2]     Petitioner is currently incarcerated at Riverbend Maximum Security Institution ("RMSI") where Wayne Carpenter is the warden. *See* Tennessee Felony Offender Information Lookup, https://apps.tn.gov/foil/search.jsp (last visited Sept. 23, 2013); *see* Tennessee Department of Correction, http://www.tn.gov/correction/institutions/rmsi.html (last visited Sept. 23, 2013). The Clerk shall record the respondent as RMSI Warden Wayne Carpenter. The Clerk shall terminate all references to Roland Colson as the respondent.

## I.   BACKGROUND

On September 25, 2001,[3] a Shelby County jury found Thomas guilty of felony murder based on the death of James Day ("Day"), an armored truck guard, following a robbery in a Walgreens parking lot in Memphis, Tennessee. Thomas v. State, No. W2008-01941-CCA-R3-PD, 2011 WL 675936, at *1 (Tenn. Crim. App. Feb. 23, 2011).[4] The Tennessee Supreme Court's recitation of the facts is as follows.

> Shortly after 12:30 p.m. on April 21, 1997, the
> defendant [Thomas] and his co-defendant, Bond, saw an

---

[3]     Judge Joseph B. Dailey presided over the trial of Petitioner and his co-defendant Anthony Bond ("Bond"). (See ECF No. 12-13 at PageID 947.) The trial began on September 17, 2001, and continued until September 26, 2001. (Id.) Thirty witnesses testified in the guilt stage of the trial. The State presented testimony from Betty Gay, Charles Young, Darren Goods, Tony Arvin, David Little, William L. Sanders, Christopher Sains, Gary Craig, Lajunta Kay Sikes, James Hibbler, Jason Fleming, Angela Jackson, Tanya Monger, Treveous Garrett, Kelvin McClain, Laudeemer Leabres, R. Hulley, Conrad Wilson, Jerry Sims, Richard Fisher, Chad Golden, Faye Day Cain, Dr. O. C. Smith, and Dr. Cynthia Gardner. (See id. at PageID 951-58.) "A videotape of the shooting captured by Walgreens' surveillance cameras was played for the jury." Thomas v. State, No. W2008-01941-CCA-R3-PD, 2011 WL 675936, at *2 (Tenn. Crim. App. Feb. 23, 2011). Bond presented the testimony of Tony Nadlicki. (See ECF No. 12-13 at PageID 958.) Petitioner presented the testimony of Robert Fisher, Stephanie Williams, William Upchurch, and Russell Carpenter. (Id. at PageID 958-59.) The State presented rebuttal testimony from Cedric Day and Angela Jackson. (Id. at PageID 959.) The jury began deliberations in the guilt phase on Monday, September 24, 2001, at 4:05 p.m. (ECF No. 13-2 at PageID 2996.) The jury continued deliberations until 10:05 p.m. that night. (Id. at PageID 3003.) Deliberations continued on Tuesday, September 25, 2001, at 9:00 a.m., and the jury returned its verdict that day. (Id. at PageID 3004.)

The penalty phase began the same day with the State presenting the testimony of Joe Warren and Faye Day Cain. (See id. at PageID 3037, 3069.) Petitioner presented the testimony of Warren, Andre Barber, Luella Barber, Alacia Bolden, Stephanie Williams, and Tamara Weeks. (See ECF No. 12-13 at PageID 962-964.) Deliberations commenced at 11:15 a.m. on Wednesday September 26, 2001. (ECF No. 13-4 at PageID 3364.) The jury returned its verdict after 1:00 p.m. that day and sentenced Petitioner to death. (Id. at 3368-69.)

[4]     Bond confessed to being the driver of the getaway car, and testified at Thomas's 1998 federal trial. Thomas, 2011 WL 675936, at *6. Bond entered a guilty plea to one count of robbery affecting commerce in federal court and was sentenced to twelve years in prison. Id. at *6 n.1. Bond was thereafter convicted of first-degree felony murder in the state court and received life without the possibility of parole. State v. Thomas, No. W2001-02701-CCA-R3-DD, 2004 WL 370297, at *1 (Tenn. Crim. App. Feb. 27, 2004).

armored truck guard with a money deposit bag leaving a Walgreens drug store on Summer Avenue in Memphis, Tennessee. The defendant ran up, shot the guard in the back of the head, grabbed the deposit bag, and jumped into a white car being driven by Bond. The defendant and Bond abandoned the white car on a street behind Walgreens, got into a red car that the defendant had borrowed from his girlfriend, and drove away.

Betty Gay, a Walgreens' employee, heard the gunshot and then saw the armored truck guard, James Day, lying in the parking lot. She saw a man running from the scene with a gun and the deposit bag. Charles Young, the assistant manager of Walgreens, ran outside and saw Day lying face down in a pool of blood. Day, who was conscious, told Young, "Call my wife." Day remained conscious and continued to talk until an ambulance arrived.

Several witnesses described the cars used by the defendant and Bond and gave descriptions of the occupants to the police. One witness, Richard Fisher, testified that he saw a white car "speed" around the armored truck in the front of the store and that the car was within four feet of him. Fisher later identified the defendant as the passenger in the white car.

Later on the afternoon of April 21st, the defendant and Bond arrived at the apartment of Angela Jackson [("Jackson")], who was then the defendant's girlfriend. According to Jackson, the two men were "excited" and "out of breath." After telling Bond to get rid of the gun, the defendant began taking money, checks, and food stamps from small white envelopes that had been in Bond's jacket. The defendant and Bond divided the money.

Jackson testified that later that same day, the defendant bought a customized car with gold plates and spoke wheels for $3,975 in cash. The car was titled in Jackson's name. Afterward, the defendant told Jackson that they needed to get a hotel room. While watching a news report that evening at the hotel about the shooting, the defendant told Jackson that the victim "did not struggle for his life" and that he had "grabbed the nigger by the throat and shot him."

On the day after the shooting, Jackson opened a bank account in her name and deposited $2,401.48 in cash. Two days later, she bought a shotgun because the defendant

3

said they needed it "for protection." According to Jackson, the defendant later bought a gold necklace for himself and wedding rings for both of them. After getting married in May, the couple separated two months later. The defendant told Jackson not to tell police about the robbery.

The victim, James Day, did not immediately die from the gunshot wound to the back of his head. Instead, the gunshot damaged his spinal cord and resulted in paraparesis (a profound weakness in one's abdomen and legs) and neurogenic bladder (a loss of bladder and bowel control due to nerve damage). Faye Day Cain, the victim's widow, testified that her husband underwent numerous surgeries, needed constant care and medical attention, and was unable to work. He was confined to one room, was unable to use the bathroom, and became depressed. In late September of 1999, Day was rushed to the hospital for emergency surgery after his bladder ruptured. The condition caused an infection; Day's condition continued to worsen, and he finally died on October 2, 1999.

The medical examiner for Shelby County, Tennessee, Dr. O.C. Smith, testified that the cause of Day's death was sepsis, "secondary to the rupture of his bladder resulting from spinal cord injury caused by the gunshot wound to his head." Dr. Smith considered Day's death a homicide, and he stated that the "infection from the ruptured bladder" could be "directly related back to [the] gunshot wound." Dr. Smith conceded that Day suffered from heart disease, high blood pressure, diabetes, and obesity, but he stated that these conditions did not cause the death. Dr. Smith's assistant, Dr. Cynthia Gardner, likewise testified that Day's death resulted from the injuries caused by the gunshot wound.

A videotape of the shooting captured by Walgreens' surveillance cameras was played for the jury. A videotape made from the original was also played for the jury at a slower speed. Angela Jackson identified the defendant as the gunman who shot the guard in the back of the head from a still photograph that had been made from the videotape.

After considering the evidence, the jury convicted the defendant of felony murder based on the killing of the victim "during an attempt to perpetrate robbery as

4

charged in the indictment." The trial court then held a sentencing hearing for the jury to determine the punishment.

State v. Thomas, 158 S.W.3d 361, 373-75 (Tenn. 2005) (footnote omitted).

Regarding his state conviction and death sentence, Thomas filed a § 2254 Petition claiming violations of his "Fifth, Sixth, Eighth, and Fourteenth Amendment rights, resulting in Thomas's unconstitutional conviction and sentence of death." (ECF No. 1 at 6-7.) The instant Motion relates to this § 2254 Petition.

On November 13, 1998, almost three years prior to the state-court trial, Thomas was convicted by a jury in federal court based on this same incident on one count of "Interference with Commerce by Threats or Violence," pursuant to 18 U.S.C. § 1951; one count of "Carry and Use of a Firearm During and in Relation to a Crime of Violence," pursuant to 18 U.S.C. § 924(c); and one count of "Felon in Possession of a Firearm," pursuant to 18 U.S.C. §§ 922(g) and 924(e). (See Judgment, United States v. Thomas, No. 98-cr-20100, ECF No. 81 (W.D. Tenn. Feb. 17, 1999); see also Verdict, United States v. Thomas, No. 98-cr-20100, ECF No. 67 (W.D. Tenn. Nov. 13, 1998).) Jackson testified at this earlier federal trial, as well. Regarding these federal convictions and sentences, Thomas filed a motion to vacate this Court's judgment pursuant to 28 U.S.C. § 2255. This motion is currently pending in this Court. (See United States v. Thomas, No. 03-cv-2416-JPM-tmp (W.D. Tenn. June 2, 2003) ("§ 2255 proceeding").)

At an evidentiary hearing on October 12 and 13, 2011, in the related § 2255 proceeding, Scott A. Sanders ("Sanders"), Chief Inspector of the United States Marshal's Service, testified about Jackson, a witness against Thomas in both the federal and state trials:

> Q:   Do you know whether Ms. Jackson was ever paid anything in the form of a reward or anything else in connection with her testimony?
>
> [Sanders]:   Yes, she was.   After the conclusion of the case, after the sentencings[] I believe[,] she was given the sum of $750.

(ECF No. 1-8 at PageID 165:5-9; see also Thomas, No. 03-cv-2416-JPM-tmp, ECF No. 133 at PageID 2017:5-9.)   Sanders continued,

> Q: And who provided the money?
>
> [Sanders]: The FBI funded the payment, and I believe I paid her.

(ECF No. 1-8 at PageID 165:10-11; see also Thomas, No. 03-cv-2416-JPM-tmp, ECF No. 133 at PageID 2017:10-11.)   Federal Bureau of Investigation ("FBI") records reflect that Jackson was paid the sum of $750 on December 18, 1998. (Thomas, No. 03-cv-2416-JPM-tmp, ECF No. 153-1 at PageID 3158 ¶ 8; see also id. at PageID 3161-64.)

After the October 2011 evidentiary hearing, Sanders filed a declaration further setting out the circumstances surrounding a November 4, 1997, interview of Jackson and the December 18, 1998, post-conviction $750 payment. (Thomas, No. 03-cv-2416-JPM-tmp, ECF No. 153-1.) Thomas was sentenced in the federal case on February 16, 1999. (United States v. Thomas, No. 98-cr-20100-JPM-1, ECF No.

6

79 (W.D. Tenn. Feb. 16, 1999).) At the time of the April 21, 1997, robbery, Sanders was a deputy U.S. Marshal assigned to work as a task force officer on the FBI's Safe Streets Task Force in Memphis, Tennessee. (Id. at 1; see Thomas, No. 03-cv-2416-JPM-tmp, ECF No. 132 at PageID 1945-46.) Sanders stated in his 2011 declaration:

> 4.   At the time Ms. Jackson was giving us her statement no agent offered any sort of immunity in exchange for her truthful statement or subsequent testimony. As a matter of practice[,] investigators are not authorized to do this without prior approval from the U.S. Attorney's Office who has prosecutorial jurisdiction.
>
> 5.   At no time was Jackson ever informed that she had criminal liability related to this case nor was she threatened with prosecution if she did not cooperate. My statement in regards to her possibly being charged with being an Accessory After the Fact at the October 12 and 13, 2011 [sic] hearing was in direct response to the question posed to me by the attorney that day. In other words, it would have been possible, but authorities were not holding that possibility over her head to get her to cooperate and testify on behalf of the government.
>
> 6.   The $750.00 payment that was subsequently given to Ms. Jackson was not anticipated, planned, or discussed with her at all prior to the payment being made.

(Thomas, No. 03-cv-2416, ECF No. 153-1 at PageID 3157 ¶¶ 4-6.)

## II.   DISCOVERY REQUESTS

Thomas requests leave to conduct discovery related to the following four claims in his § 2254 Petition:

> Claim No. 1: The State Violated Thomas's Constitutional Rights By Failing to Comply with Its Discovery Obligations under Brady v. Maryland;[5]
>
>      . . . .

---

[5]      Brady v. Maryland, 373 U.S. 83 (1963).

Claim No. 2: The State Violated Andrew Thomas's Constitutional Rights by Presenting Angela Jackson's False Testimony;

. . . .

Claim No. 3: Thomas is Actually Innocent of Day's Felony Murder;

. . . .

Claim No. 4: Andrew Thomas was Denied Effective Assistance of Counsel Throughout the State Court Proceedings.

(ECF No. 1 at 17-29, 29-35, 36-60, 60-93; see also ECF No. 25-1 at 2-3.)[6]

He seeks:

1. To serve subpoenas duces tecum on Angela Jackson and the relevant federal and state law enforcement authorities to discover documentary evidence relating to the foundation, composition, and regulations and procedures governing the Safe Streets Task Force;

2. To discover documentary evidence relating to the $750 payment made to Angela Jackson by the Safe Streets Task Force, and to discover any additional impeachment and/or exculpatory evidence that has been improperly withheld in this case (including - but not limited to — any payments, deals, agreements, compensation, or any type of incentive offered or provided to any witness against Thomas in connection with his federal or state trial), and to discover documents related to any custom or practice of the Memphis FBI Office, the Memphis Police Department, or of the Safe Streets Task Force to make payments to witnesses other than the $40.00 witness fee authorized by 28 U.S.C.

---

[6]     In the instant Motion, Thomas requests discovery related to the Brady and false-testimony claims. (See ECF No. 25 at 1.) In Thomas's supporting memorandum, he also requests discovery to support his actual-innocence and ineffective-assistance-of-counsel claims. (See ECF No. 25-1 at 2-3, 18-21.)

§ 1821(b), including a list of all individuals who have received such a payment in the past three years;

3.     To take depositions of individuals who may have knowledge relevant to Thomas's <u>Brady</u>, false testimony, actual innocence, and ineffective assistance of counsel claims or the practice of paying witnesses for their "cooperation" during criminal investigations and trial, including — but not limited to — Angela Jackson, U.S. Marshal Scott Sanders, Thomas Bernard Locke, Stephen D. Anthony, Special Agent William M. Carter, Assistant U.S. Attorney Tony Arvin, Amy Weirich, Jennifer Nichols, Michael Scholl and any and all other state or federal prosecutors and law enforcement officers involved in Thomas's investigation and trial; and

4.     To depose other witnesses and individuals who are identified as having received money from Memphis federal and state law enforcement authorities in connection with their cooperation with an investigation and/or testimony in favor of the prosecution at trial.

(ECF No. 25 at 1-2; <u>see</u> ECF No. 25-1 at 3-4, 14-15.) Thomas filed a document outlining proposed subpoena <u>duces tecum</u> topics and areas of inquiry with the instant Motion. (ECF No. 25-2.)

## III. STANDARDS APPLICABLE TO THE INSTANT MOTION

Habeas petitioners do not have an automatic right to discovery. <u>Johnson v. Mitchell</u>, 585 F.3d 923, 934 (6th Cir. 2009) (quoting <u>Stanford v. Parker</u>, 266 F.3d 442, 460 (6th Cir. 2001)). Discovery in habeas cases is controlled by Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules"). Rule 6(a) states:

A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery.

See Cornwell v. Bradshaw, 559 F.3d 398, 410 (6th Cir. 2009) ("For good cause shown, the district court has the discretion to allow discovery in a habeas proceeding . . . ."). Habeas Rule 6 "is meant to be 'consistent'" with the Supreme Court's decision in Harris v. Nelson, 394 U.S. 286, 300 (1969). Bracy v. Gramley, 520 U.S. 899, 909 (1997). In Harris, the Court stated,

> [W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.

Harris, 394 U.S. at 300.

"Good cause" is not demonstrated by "bald assertions" or "conclusory allegations." Stanford, 266 F.3d at 460; accord Williams v. Bagley, 380 F.3d 932, 974 (6th Cir. 2004). Rather, the requested discovery must be materially related to claims raised in the habeas petition and likely to "resolve any factual disputes that could entitle [the petitioner] to relief." Williams, 380 F.3d at 975 (quoting Stanford, 266 F.3d at 460); see Bracy, 520 U.S. at 908-09 (allowing discovery relevant to "specific allegations" of fact in support of a claim of constitutional error); Post v. Bradshaw, 621 F.3d 406, 425 (6th Cir. 2010) (stating discovery provides petitioner "that extra evidence" he needs "to prove or strengthen his case"); Braden v. Bagley, No. 2:04-CV-842, 2007 WL 1026454, at *2 (S.D. Ohio Mar. 30, 2007) ("Rule 6's 'good cause' standard requires petitioner to at least attempt to identify what

he expects to uncover through his discovery requests.").[7] Although "more liberal discovery is appropriate in capital [habeas] cases," Payne v. Bell, 89 F. Supp. 2d 967, 971 (W.D. Tenn. 2000) (citing Lockett v. Ohio, 438 U.S. 586, 604 (1978)), Rule 6(a) does not permit a "fishing expedition masquerading as discovery," Stanford, 266 F.3d at 460.

There is no clear entitlement to discovery in support of procedurally defaulted habeas claims. See Williams, 380 F.3d at 975-76 (finding no error in district court's denial of discovery on procedurally defaulted ineffective-assistance-of-counsel claims); Royal v. Taylor, 188 F.3d 239, 249 (4th Cir. 1999) (finding no error in district court's denial of discovery on procedurally defaulted due-process claims); Calderon v. U.S. Dist. Court for the N. Dist. of Ca., 98 F.3d 1102, 1106 (9th Cir. 1996) (issuing mandamus to prevent discovery awarded by district court because petitioner had not filed a habeas petition with exhausted claims or sought such discovery in the state court); Sherman v. McDaniel, 333 F. Supp. 2d 960, 969-70 (D. Nev. 2004) (denying discovery on unexhausted claims because "[t]o do so would tend to undermine the exhaustion requirement, and the doctrine of federal-state comity on which it rests"). But see Conway v. Houk, No. 3:07-cv-345, 2009 WL

---

[7]    A petitioner may show good cause under Habeas Rule 6 without meeting the higher standard for an evidentiary hearing in 28 U.S.C. § 2254(e)(2). Payne v. Bell, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000); see Braden, 2007 WL 1026454, at *6 (distinguishing discovery from factual development under § 2254(e)(2)); see also Simmons v. Simpson, No. 3:07-CV-313-S, 2009 WL 4927679, at *5-6 (W.D. Ky. Feb. 12, 2009) (stating that this view is not unanimously held by all federal courts).

961199, at *3 (S.D. Ohio Apr. 8, 2009) ("So long as the procedural default defense has not been adjudicated, its pleading does not provide a basis to deny discovery."); <u>Hutton v. Mitchell</u>, No. 1:05-CV-2391, 2008 WL 4283318, at *2 (N.D. Ohio Sept. 16, 2008) (stating that allegations of procedural default will not bar discovery). "[A] habeas petitioner may use a Habeas Rule 6 discovery motion to obtain evidence relevant to excusing procedural default." <u>Payne</u>, 89 F. Supp. 2d at 974 (granting discovery motion in support of a presumptively defaulted claim because the motion sought to discover evidence which would allow the petitioner to obtain a factual basis to excuse default, i.e., his "actual innocence"); <u>see</u> <u>Braden</u>, 2007 WL 1026454, at *10 (granting the deposition of a mitigation specialist where the request was reasonably calculated to lead to evidence that could demonstrate a justification for excusing the apparent default of the petitioner's claim).

## IV. ANALYSIS

Thomas asserts that his counsel had no knowledge of the payment to Jackson until Sanders testified in October 2011 in the § 2255 Proceeding. (ECF No. 25-1 at 2.) To support Thomas's <u>Brady</u> and false-testimony claims, he provides his defense counsel Michael Scholl's declaration that "[a]t no time before, during, or after the trial was I aware that Ms. Jackson had received any kind of money, reward, compensation, or deal from the investigators,

prosecutors, or any other entity in connection with the Walgreens robbery." (Id. at 8; see ECF No. 1-6 ¶ 4.) Thomas contends that all evidence of the payment continued to be suppressed during his direct appeal and post-conviction appeals and was not "finally revealed" until the evidentiary hearing in the § 2255 Proceeding. (ECF No. 25-1 at 10.) He argues that his attempts to investigate facts related to the payment through Freedom of Information Act and Tennessee Public Records Act requests "were either denied or yielded a very limited production of data." (Id. at 10-11.)

Thomas contends that this new evidence of the payment to Jackson gives him good cause to seek additional discovery for his Brady claims, false-testimony claims, actual-innocence claims, and claims of ineffective assistance of trial and appellate counsel. (Id. at 2-3.) He argues that the payment was made several years prior to the state trial, that Jackson testified twice during the state-court trial that "she had not received a 'reward' in connection with her testimony against Thomas," that the prosecution withheld information about the payment, and that the prosecution used Jackson's false testimony to bolster her credibility. (Id. at 2, 8-9.) Thomas contends that in two motions, his counsel specifically requested that the State disclose "any and all considerations or promises of consideration given to or made on behalf of prosecution witnesses" (id. at 6 (quoting ECF No. 1-4 at PageID 141-50)) and the trial court instructed the State to inform

defense counsel "of any deals that might have been made or consideration given in exchange for any testimony" (id. (quoting ECF No. 25-5 at PageID 8114:13-15)). Thomas contends that the State responded that it would advise defense counsel promptly of any consideration given or promises made and that defense counsel had access to open-file discovery. (Id.) Thomas argues that his defense counsel's primary strategy at trial was to attack Jackson's motives for testifying and that the State's case "hinged on the jury's perception of Angela Jackson's credibility." (Id. at 7.)

### A.   Discovery Related to Specific Claims

#### 1.   Brady

Under Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the case would have been different." Wogenstahl v. Mitchell, 668 F.3d 307, 323 (6th Cir. 2012) (quoting Wilson v. Parker, 515 F.3d 682, 701 (6th Cir. 2008)) (internal quotation marks omitted). To prevail on a Brady claim, a petitioner must establish that (1) "the evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "the evidence [was] suppressed by the State, either willfully or inadvertently";

and (3) "prejudice . . . ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999); <u>accord</u> <u>Bell v. Bell</u>, 512 F.3d 223, 240 (6th Cir. 2008).

Thomas requests leave to conduct the following discovery to support his <u>Brady</u> claim:

(1)  any and all deals between Angela Jackson (and any other fact witness in Thomas's trial) and federal and/or state authorities in connection with her cooperation and testimony in Thomas's federal and state trials;

(2)  the Safe Streets Task Force's justification for making the $750 payment to Angela Jackson;

(3)  the process by which Scott Sanders requested approval for the payment to Angela Jackson and received authorization to do so;

(4)  the monetary source(s) of the payment to Angela Jackson;

(5)  the legal authority for the Safe Streets Task Force to make such a payment to a fact witness in a criminal trial;

(6)  how often the federal and state law enforcement authorities in Memphis were making similar payments to fact witnesses in criminal trial at that time;

(7)  whether that practice has continued into the present and its prevalence;

(8)  whether the federal and state law enforcement authorities in Memphis have any guidelines, criteria or memoranda outlining when and under what authority such a payment can and should be made to a fact witness in a criminal trial; and

(9)  the composition, relationship, and respective roles of the state and federal law enforcement agencies that comprise the Safe Streets Task Force.

(ECF No. 25-1 at 14-15.) Thomas argues that he has good cause for discovery related to his <u>Brady</u> claim because specific factual allegations about the payment from the Safe Streets Task Force to Jackson provide "reason to believe that full development of the facts will enable Thomas to demonstrate that he is entitled to relief." (ECF No. 25-1 at 12-13.) Thomas asserts that the State never informed him or his counsel that Jackson had received any payment in connection with her testimony in the federal trial despite the State's independent duty to disclose such information, specific requests from Thomas's counsel to do so, and the court's pre-trial instruction to disclose any deals or consideration. (<u>Id.</u> at 13.)

Respondent argues that the information requested could not form the basis of relief "because knowledge of the action of federal agents is not imputed to the State." (<u>ECF</u> No. 26 at 3.) He asserts that <u>Brady</u> does not impose an affirmative duty on the government to discover information that it does not possess. (<u>Id.</u> at 4-5.) Respondent argues that Thomas has not made a prima facie showing that the Safe Streets Task Force consisting of state and federal agents worked as one prosecutorial team in relation to his prosecution. (<u>Id.</u> at 5.) Respondent argues that the allegation in the instant Motion that a joint task force paid Jackson contradicts Thomas's Petition, which alleges that Jackson's payment for her federal-court testimony came from the FBI. (<u>Id.</u>) Respondent also

argues that Thomas cannot show that the information requested is material because Thomas alleges only that Jackson had a motivation to testify in the federal trial and has not alleged a rationale as to why this evidence would have been exculpatory for purposes of the state trial. (<u>Id.</u> at 6.) Respondent contends that the payment would not have been material in light of the eyewitness accounts and video evidence showing Thomas committed the murder and robbery and the fact that Jackson used the proceeds Thomas gave her to open a bank account two days later. (<u>Id.</u>)

In response to Respondent's argument regarding imputing information known by a federal agency to the State, Thomas asserts that Respondent fails to acknowledge that the Safe Streets Task Force is not simply a federal entity, but a "conglomeration of federal <u>and</u> state law enforcement agencies." (ECF No. 25-1 at 13.) Thomas states that his discovery is targeted to "understanding the precise relationship and operations of the Safe Streets Task Force and showing that, as a multi-agency coalition, the Safe Streets Task Force is unquestionably bound by the rule set forth in <u>Brady</u>." (<u>Id.</u> at 13-14.) Thomas argues that "there is a reasonable probability that [Jackson's] credibility would have been irreparably damaged in the eyes of the jury" if they had known of the payment. (<u>Id.</u> at 14.) Further, he argues that should discovery lead to evidence that other witnesses received payments beyond the statutorily allocated amount, all of the witness statements taken

by the Safe Streets Task Force in connection with the Thomas investigation could be subject to attack on the basis of the witnesses' credibility. (<u>Id.</u>; <u>see</u> ECF No. 29 at 5-6.)

Respondent argues that Thomas's requests are over-broad because they do not list the specific state agencies or the specific individuals from whom he seeks the information. (ECF No. 26 at 7.) Respondent contends that Thomas seeks a "blank check to depose, at his discretion, any individual in law enforcement or fitting within an undefined task force." (<u>Id.</u>) Respondent argues that there is no evidence that the Safe Streets Task Force "is a concrete agency with a physical location, address or officers who could respond to his requests." (<u>Id.</u>) Respondent contends that Thomas's requests "fan well beyond the scope of this case"; are not limited in terms of time frame, issues, or parties; and are irrelevant to the extent they seek the process and legal justification for the compensation of witnesses. (<u>Id.</u>) Respondent asserts that Thomas fails to allege specific facts as to what information he will uncover or how the information will assist specific claims and presents no factual basis to demonstrate that he will learn anything more than what he already knows. (<u>Id.</u>)

### 2. False Testimony

Thomas's second ground for relief addressed the State's proffer of and failure to correct "Jackson's false testimony that

18

she had not received any payment or other benefit in connection with her testimony against Thomas." (ECF No. 25-1 at 15.)

A Brady violation can also arise from the prosecution's knowing use at trial of perjured testimony. See Kyles v. Whitley, 514 U.S. 419, 433 (1995) (citing United States v. Agurs, 427 U.S. 97, 103-04 (1976)). "To prove that the prosecutor's failure to correct false testimony violated [Thomas's] due process rights, [he] must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." Wogenstahl, 668 F.3d at 323 (quoting Rosencrantz v. Lafler, 568 F.3d 577, 583-84 (6th Cir. 2009)) (internal quotation marks omitted). "A conviction obtained by the knowing use of perjured testimony must be set aside if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." Id. (alterations in original) (quoting Rosencrantz, 568 F.3d at 583) (internal quotation marks omitted).

Thomas argues that good cause for discovery exists because (1) Jackson's testimony at the state trial was "indisputably false"; (2) Jackson's testimony was material because the jury would have questioned the veracity of Jackson's story if it had known of the payment; and (3) the prosecution knew or should have known of the task force payment and that Jackson's testimony was false. (ECF No. 25-1 at 16-17.)

19

In support of the false-testimony claim, Thomas requests leave to conduct the following discovery: "(1) any discussion or knowledge of the state or federal law enforcement authorities regarding Angela Jackson's false testimony; [and] (2) any determination made by those entities relating to that false testimony." (Id. at 17.)

Respondent argues that the same standard for imputing knowledge to the State applies to Thomas's false-testimony claims. (ECF No. 26 at 4.) He asserts that Thomas does not allege that the prosecution had actual knowledge of any false testimony or exculpatory evidence. (Id. at 4-5.)

### 3. Actual Innocence

Thomas argues that he is actually innocent of any crime connected with the Walgreens robbery. (ECF No. 25-1 at 18; see ECF No. 1 at 36-60.) Thomas argues, based on House v. Bell, 547 U.S. 518 (2006), that he would have to make "'a truly persuasive demonstration' of actual innocence based upon 'all the evidence' . . . without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" (ECF No. 25-1 at 18 (alteration in original) (quoting House, 547 U.S. at 537-38, 554).) Thomas argues that he has good cause for discovery regarding the payment to Jackson, any deal she struck, and her motivations to testify against Thomas because Thomas is factually innocent; was not a participant in the robbery;

and Bond admitted that Bobby Jackson, not Thomas, was his accomplice. (Id. at 18-19.)

Respondent argues that actual innocence has never been recognized as a cognizable claim by the United States Supreme Court. (ECF No. 26 at 8); see Herrera v. Collins, 506 U.S. 390, 417 (1993). Respondent argues that in Schlup v. Delo, 513 U.S. 298 (1995), the Supreme Court stated that a Herrera free-standing actual-innocence claim would fail "unless the federal habeas court is itself convinced that those new facts unquestionably establish [the petitioner's] innocence." (Id. at 8 (quoting Schlup, 513 U.S. at 317).) Respondent argues that Thomas has not alleged specific evidence that could be obtained in discovery that would strengthen his actual-innocence claim. (Id.) Respondent notes that Jackson has been cross-examined about her motives in several proceedings and that her prior testimony on cross-examination mitigates the need for a deposition. (Id. at 9.)

### 4. Ineffective Assistance of Counsel

Thomas argues that the Tennessee post-conviction courts denied relief on his claims of ineffective assistance of trial and appellate counsel because Jackson independently provided "overwhelming" evidence of his guilt. (ECF No. 25-1 at 20.) He asserts that discovery regarding the payment to Jackson and her motivation to testify would strengthen his ineffective-assistance

21

claims and demonstrate that he was prejudiced by his counsel's deficiencies at trial and on direct appeal. (Id.)

Respondent argues that Thomas litigated his ineffective-assistance claim in the state court, and therefore discovery is precluded by Cullen v. Pinholster, 131 S. Ct. 1388 (2011), which limits the scope of review on an exhausted claim to the record that existed in state court when the claim was decided. (ECF No. 26 at 9 (citing Pinholster, 131 S. Ct. at 1401).)

**B.    Analysis of Discovery Requests**

In the instant Motion and supporting memorandum, Thomas outlines the discovery he seeks and provides an attachment to the Motion with proposed subpoena duces tecum topics and areas of inquiry. (See ECF No. 25; ECF No. 25-1; ECF No. 25-2.) Thomas reserved "the right to supplement these requests should depositions, documents, or any other discovery reveal cause for further inquiry." (ECF No. 25-2 at PageID 8076, 8079, 8082.) Thomas responds to Respondent's assertions that the requests are over-broad and unduly specific by stating that the proposed discovery "was provided simply to give the Court a sense of the types of inquiries crucial to this habeas petition." (ECF No. 29 at 2.)[8] Thomas asserts that if the Court grants discovery and Thomas subsequently issues subpoenas or discovery requests, Respondent

---

[8]    In his Reply, Thomas argues that these are proposed requests not subject to challenge by Respondent and have been provided as "a draft outline of the type of information that Thomas may seek if the motion is granted." (ECF No. 29 at 8.)

will have an opportunity to challenge the discovery requests at that time. (<u>Id.</u>)

Habeas Rule 6(b) states, "A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents."  The Habeas Rules place a duty on the petitioner's counsel to specify what he is seeking in discovery. Only with that information can the Court make a good cause determination. <u>See</u> Habeas Rule 6(b) advisory comm. notes, (1976 Adoption, Subdivision (b)) (stating the discovery requests must accompany the motion "to advise the judge of the necessity for discovery and enable him to make certain that the inquiry is relevant and appropriately narrow"). In the interest of both judicial economy and in the spirit of Habeas Rule 6, the Court will address only the specific discovery requests and topics of inquiry proposed by Thomas in his submission filed at ECF No. 25-2. Further, despite Thomas's reservation of the right to supplement these requests, there is no right to discovery in a habeas case, and any request for additional discovery must be made by motion to the Court.

### 1.   Safe Streets Task Force

Thomas argues that there is no dispute that a multi-jurisdictional, multi-agency task force named the "Safe Streets Task Force" investigated the Walgreens robbery. (ECF No. 29 at 2-

4.) Thomas cites trial testimony from Memphis Police Department ("MPD") Officer Chad Golden that the Safe Streets Task Force is a multi-jurisdictional task force comprised of officers and agents from the MPD, the Shelby County Sheriff's Department ("SCSD"), the United States Marshal's Service, and possibly a member of the Collierville Police Department. (Id. at 2-3 (citing ECF No. 12-19 at PageID 2100-01).) Golden testified that the Safe Streets Task Force "investigat[ed] crimes that fall under the Hobbs Act — specifically bank robberies — any crimes that affect interstate commerce or . . . thefts of money that's insured by the FDIC." (ECF No. 12-19 at PageID 2101:3-6.) At the evidentiary hearing in the § 2255 proceeding, Sanders testified that he investigated the Walgreens murder as part of the Safe Streets Task Force, which was established by the FBI and was comprised of officers from the MPD, the SCSD, the FBI, and the Marshal's Service. (ECF No. 24-1 at PageID 7933:10-15.) Thomas argues that "[t]he Safe Streets Task Force was exclusively involved in investigating the shooting and robbery of James Day." (ECF No. 29 at 4.) He contends that under Brady, a "prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case" and "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." (Id. (alteration in original) (quoting United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998))

24

(internal quotation marks omitted).) Thomas contends that because the Safe Streets Task Force was the law-enforcement agency investigating the crime, the state prosecutors had an obligation to learn of any <u>Brady</u> material, including the payment to Jackson. (<u>Id.</u> at 5.) Thomas argues that he has good cause for discovery related to his false-testimony claims to determine the facts and circumstances of the $750 payment because he has been denied his right to potentially impeaching evidence. (<u>Id.</u> at 5-6.) Thomas argues that additional discovery regarding the $750 payment could elucidate his actual-innocence claim. (<u>Id.</u> at 6-7.) Thomas further argues that the $750 payment is not the basis of a new claim of ineffective assistance of counsel, but rather new factual evidence that could directly support his claim on habeas review. (<u>Id.</u> at 8.)

Thomas seeks leave to subpoena the following documents from the Safe Streets Task Force:

a.  All documents and communications that refer to, reflect, or concern the creation of the Safe Streets Task Force.

b.  All documents and communications that refer to, reflect, or concern the composition of the Safe Streets Task Force from January 1, 1997 through the present.

c.  All documents and communications that refer to, reflect, or concern the regulations and/or procedures of the Safe Streets Task Force from January 1, 1997 through the present.

d.  All documents and communications that refer to, reflect, or concern the funding of the Safe Streets Task Force.

e.  All documents and communications that refer to, reflect, or concern the manner in which cases are assigned to the Safe Streets Task Force.

f.  All documents and communications that refer to, reflect, or concern collaboration between he [sic] Safe Streets Task Force and any state law enforcement agency, state district attorneys' office, or any other state agency or employee.

g.  All documents and communications that refer to, reflect, or concern the average caseload, and the caseload at the time of the Thomas investigation, of the Safe Streets Task Force.

h.  All documents and communications that refer to, reflect, or concern the exact composition, including number and identities of each member, of the Safe Streets Task Force that investigated the Thomas case.

i.  All documents and communications that refer to, reflect, or concern any payments made by the Safe Streets Task Force to Angela Jackson.

j.  All documents and communications that refer to, reflect, or concern any payments made by the Safe Streets Task Force to any witness who testified at Thomas's federal or state trial.

k.  All documents and communications that refer to, reflect, or concern any payments made by the Safe Streets Task Force to any witness from January 1, 1997 through the present.

l.  All documents and communications that refer to, reflect, or concern any custom or practice of the Safe Streets Task Force regarding the payment of witnesses from January 1, 1997 through the present.

m.  All documents and communications that refer to, reflect, or concern the investigation of the Thomas case by the Safe Streets Task Force.

n.  All documents and communications that refer to, reflect, or concern the interactions between the Safe Streets Task Force and any other law

enforcement agency, prosecutor's office, or other state or federal government agency or employee.

o.   All documents and communications that refer to, reflect, or concern any payments made by the Memphis office of the Federal Bureau of Investigation to any witness from January 1, 1997 through the present.

p.   All documents and communications that refer to, reflect, or concern any payments made by the Memphis office of the Department of Justice, United States Attorney, or any other federal agency or employee to any witness from January 1, 1997 through the present.

q.   All documents and communications that refer to, reflect, or concern any discussion related to the testimony of Angela Jackson at either Thomas'[s] state trial or Thomas'[s] federal trial.

(ECF No. 25-2 at PageID 8076-8077 ¶¶ (A)(1)(a)-(q).)

Thomas proposed the following areas of inquiry for the deposition of the Safe Streets Task Force:

a.   The circumstances surrounding the foundation of the Safe Streets Task Force, as well as its composition and any regulations or procedures that govern it.

b.   Any payments, deals, compensation or incentives offered or provided to any witnesses that testified for the prosecution in Thomas's federal trial, whether offered in connection with their cooperation in the investigation of the Walgreens robbery or for testimony at trial. The circumstances surrounding that transaction or offer, including the amount, date, location, legal foundation, source of money or authorization for the deal, process of approval and reason for each payment, deal or compensation.

c.   Any and all payments, deals, compensation or incentives offered or provided to Angela Jackson in connection with the investigation of the Walgreens robbery and her subsequent testimony against Andrew Thomas during his federal trial.

d. The individuals who interacted with Angela Jackson in connection with the investigation of the Walgreens robbery and her subsequent testimony against Andrew Thomas before the grand jury and at trial, including their present-day or last known contact information if available.

e. The individuals who had a role in formulating, approving and offering the $750 payment to Angela Jackson in connection with her role in the investigation of the Walgreens robbery and subsequent testimony against Andrew Thomas during his federal trial.

f. The monetary source(s) of the $750 payment to Angela Jackson in connection with her role in the investigation of the Walgreens robbery and subsequent testimony against Andrew Thomas during his federal trial.

g. The legal foundation for the authorization of the $750 payment to Angela Jackson in connection with her role in the investigation of the Walgreens robbery and subsequent testimony against Andrew Thomas during his federal trial.

h. The date, location and amount [sic] any payment made to Angela Jackson pursuant to 28 U.S.C. § 1821(b), as well as the identity of any individuals who were involved with the request, approval and/or tender of any such payment.

i. Any and all legal foundations for your office to make payments to witnesses who cooperate with investigations or testify at trial beyond 28 U.S.C. § 1821(b), as well as the procedures or regulations governing the application for any such payment to be made and the individuals who are responsible for approving and distributing any such payment.

j. The individuals who received payments from your office in connection with their cooperation with a criminal investigation or trial during the years 1997-2001 other than a payment pursuant to 28 U.S.C. § 1821(b), including the legal foundation for making those payments and the present-day or last known contact information if available.

28

  k. The individuals who received payments from your office in connection with their cooperation with a criminal investigation or trial during the past three years (2009-present) other than a payment pursuant to 28 U.S.C. § 1821(b), including the legal foundation for making those payments and the present-day or last known contact information if available.

  *l.* Any guidelines, criteria or memoranda maintained by your office that outline when and under what authority and process such a payment can and should be made to a witness in connection with their cooperation with a criminal investigation or trial, as well as the individual(s) responsible for supervising that process in 1998 and the individual who is presently responsible for supervising that process.

  m. All documents relating to the provision of information about the $750 payment to Angela Jackson to state authorities in anticipation of Thomas's state trial, as well as any individuals who were responsible for providing such information to the state authorities in anticipation of that trial.

(<u>Id.</u> at PageID 8077-8078 ¶¶ (A)(2)(a)-(m).)

  A prosecutor has a duty to learn of any favorable evidence known to investigating agents or officers assigned to the prosecution team. <u>Kyles</u>, 514 U.S. at 437-38; <u>see</u> <u>Avellino</u>, 136 F.3d at 255 ("[K]nowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases

to a state of paralysis.'" (quoting <u>United States v. Gambino</u>, 835 F. Supp. 74, 95 (E.D.N.Y. 1993))). <u>Brady</u>, however, "does not impose an affirmative duty upon the government to take action to discover information which it does not possess." <u>United States v. Graham</u>, 484 F.3d 413, 417 (6th Cir. 2007) (quoting <u>United States v. Beaver</u>, 524 F.2d 963, 966 (5th Cir. 1975)) (internal quotation marks omitted).

In <u>Goff v. Bagley</u>, 601 F.3d 445 (6th Cir. 2010), the United States Court of Appeals for the Sixth Circuit refused to impute knowledge of the key witness's plea agreement with federal prosecutors where there was no evidence that the state learned of the plea agreement and no evidence of any consideration given to the witness in exchange for his testimony. <u>Goff</u>, 601 F.3d at 475-76. If there is evidence of a joint investigation between state and federal authorities, however, the knowledge of the payment may be imputed to the prosecution using a case-by-case analysis. <u>United States v. Antone</u>, 603 F.2d 566, 570 (5th Cir. 1979); <u>see</u> <u>Taus v. Senkowski</u>, 293 F. Supp. 2d 238, 247 (E.D.N.Y. 2003) ("Were a joint investigation and prosecutorial enterprise engaged in by the F.B.I. and a district attorney's office, it might be appropriate to impute knowledge of all F.B.I. reports to a state prosecutor . . . ."); <u>see also</u> <u>United States v. Risha</u>, 445 F.3d 298, 303-306 (3d Cir. 2006) (finding the possibility of a <u>Brady</u> violation where the state and federal forces were engaged in a joint investigation). The

United States Court of Appeals for the Third Circuit articulated the following three factors in its "cross-jurisdiction constructive knowledge" analysis:

> (1) whether the party with knowledge of the information is acting on the government's "behalf" or is under its "control"; (2) the extent to which state and federal governments are part of a "team," are participating in a "joint investigation," or are sharing resources; and (3) whether the entity charged with constructive possession has "ready access" to the evidence.

United States v. Reyeros, 537 F.3d 270, 282 (3d Cir. 2008) (quoting Risha, 445 F.3d at 304) (internal quotation marks omitted).

Thomas has demonstrated good cause for discovery related to the Safe Streets Task Force and the investigation of the Walgreens robbery to determine whether a joint investigation and/or prosecution was conducted relevant to Thomas's Brady claim. Thomas is entitled to discovery to demonstrate what law-enforcement agencies were involved in the investigation of the Walgreens robbery and determine whether knowledge of the payment can be imputed to the state prosecutors. Thomas is, therefore, **GRANTED** leave to subpoena all documents and communications that refer to, reflect, or concern the following:

- the exact composition, including number and identities of each member, of the Safe Streets Task Force that investigated the Thomas case (the Walgreens robbery) (see ECF No. 25 ¶ (A)(1)(h));

31

- any payments made by the Safe Streets Task Force to Angela Jackson (<u>see</u> <u>id.</u> ¶ (A)(1)(i));

- the investigation of the Thomas case (the Walgreens robbery) by the Safe Streets Task Force (<u>see</u> <u>id.</u> ¶ (A)(1)(m)); and

- any discussion related to Jackson's testimony at either Thomas's state trial or Thomas's federal trial (<u>see</u> <u>id.</u> ¶ (A)(1)(q)).

Thomas has demonstrated good cause for the following documents to the extent that the requests are **limited to Thomas's case and the investigation of the Walgreens robbery**: document requests for all documents and communications that refer to, reflect, or concern the composition of the Safe Streets Task Force (<u>see</u> <u>id.</u> ¶ (A)(1)(b)); the collaboration between the Safe Streets Task Force and any state law-enforcement agency, state district-attorneys' office, or any other state agency or employee (<u>see</u> <u>id.</u> ¶ (A)(1)(f)); and interactions between the Safe Streets Task Force and any other law-enforcement agency, prosecutor's office, or other state- or federal-government agency or employee (<u>see</u> <u>id.</u> ¶ (A)(1)(n)) are **GRANTED IN PART,** to the extent Thomas limits his requests to his case and the investigation of the Walgreens robbery, and **DENIED IN PART,** to the extent that Thomas's requests exceed the scope defined in the Court's Order.

Many of Thomas's document requests are over-broad, not appropriately limited in time frame, and seek information for which

Petitioner has not demonstrated good cause. The discovery requests are **DENIED** for all documents and communications related to the creation (<u>see</u> ECF No. 25-2 ¶ (A)(1)(a)), regulations and procedures (<u>see</u> <u>id.</u> ¶ (A)(1)(c)), funding (<u>see</u> <u>id.</u> ¶ (A)(1)(d)), case-assignment procedures (<u>see</u> <u>id.</u> ¶ (A)(1)(e)), and the average case load or the case load at the time of the Walgreens investigation (<u>see</u> <u>id.</u> ¶ (A)(1)(g)) of the Safe Streets Task Force. Further, the discovery requests for documents and communications related to payments made by the Safe Streets Task Force to any witness who testified at Thomas's state or federal trial (<u>see</u> <u>id.</u> ¶ (A)(1)(j)); payments made by the Safe Streets Task Force to any witness from January 1, 1997 through the present (<u>see</u> <u>id.</u> ¶ (A)(1)(k)); any custom or practice of the Safe Streets Task Force about the payment of witnesses from January 1, 1997, through the present (<u>see</u> <u>id.</u> ¶ (A)(1)(*l*)); payments made by the Memphis office of the FBI to any witness from January 1, 1997 through the present (<u>see</u> <u>id.</u> ¶ (A)(1)(o)); payments made by the Memphis office of the Department of Justice, United States Attorney, or any other federal agency or employee to any witness from January 1, 1997 through the present (<u>see</u> <u>id.</u> ¶ (A)(1)(p)) are **DENIED**.

Thomas has not demonstrated good cause to take the depositions of Safe Streets Task Force members involved in the investigation of the Walgreens robbery and the payment made to Jackson. Thomas has knowledge of the payment, its timing, and source. His burden is to

establish that the state prosecutors either had knowledge of the payment or that knowledge can be imputed to the State. Petitioner has been granted discovery of Safe Street Task Force documents, <u>see</u> supra pp. 31-33. At this time, however, Petitioner has not presented sufficient factual information to establish good cause to take the depositions of unspecified Safe Street Task Force members. Thomas's request to take the deposition of Safe Street Task Force members (ECF No. 25-2 ¶ (A)(2)) is, therefore, **DENIED**.

### 2. State Law-Enforcement Agencies and Prosecutors

Thomas seeks leave to subpoena the following documents from unspecified state law enforcement agencies and prosecutors:

a. All documents and communications that refer to, reflect, or concern the creation of the Safe Streets Task Force.

b. All documents and communications that refer to, reflect, or concern the composition of the Safe Streets Task Force from January 1, 1997 through the present.

c. All documents and communications that refer to, reflect, or concern the regulations and/or procedures of the Safe Streets Task Force from January 1, 1997 through the present.

d. All documents and communications that refer to, reflect, or concern the funding of the Safe Streets Task Force.

e. All documents and communications that refer to, reflect, or concern the manner in which cases are assigned to the Safe Streets Task Force.

f. All documents and communications that refer to, reflect, or concern collaboration between he [sic] Safe Streets Task Force and any state law

enforcement agency, state district attorneys' office, or any other state agency or employee.

g.   All documents and communications that refer to, reflect, or concern the average caseload, and the caseload at the time of the Thomas investigation, of the Safe Streets Task Force.

h.   All documents and communications that refer to, reflect, or concern the exact composition, including number and identities of each member, of the Safe Streets Task Force that investigated the Thomas case.

i.   All documents and communications that refer to, reflect, or concern any payments made by the Safe Streets Task Force to Angela Jackson.

j.   All documents and communications that refer to, reflect, or concern any payments made by the Safe Streets Task Force to any witness who testified at Thomas's federal or state trial.

k.   All documents and communications that refer to, reflect, or concern any payments made by the Safe Streets Task Force to any witness from January 1, 1997 through the present.

l.   All documents and communications that refer to, reflect, or concern any custom or practice of the Safe Streets Task Force regarding the payment of witnesses from January 1, 1997 through the present.

m.   All documents and communications that refer to, reflect, or concern the investigation of the Thomas case by the Safe Streets Task Force.

n.   All documents and communications that refer to, reflect, or concern the interactions between the Safe Streets Task Force and any other law enforcement agency, prosecutor's office, or other state or federal government agency or employee.

o.   All documents and communications that refer to, reflect, or concern any payments made by the Memphis police department to any witness from January 1, 1997 through the present.

35

> p.  All documents and communications that refer to, reflect, or concern any payments made by the Memphis district attorneys' office or any other state agency or employee to any witness from January 1, 1997 through the present.
>
> q.  All documents and communications that refer to, reflect, or concern any discussion related to the testimony of Angela Jackson at either Thomas'[s] state trial or Thomas'[s] federal trial.

(ECF No. 25-2 at PageID 8079-8080 ¶¶ (B)(1)(a)-(q).)

Thomas proposed the following areas of inquiry for the deposition of state law-enforcement agencies and prosecutors:

> a.  The circumstances surrounding the foundation of the Safe Streets Task Force, as well as its composition and any regulations or procedures that govern it.
>
> b.  Any guidelines, criteria or memoranda maintained by your office that pertain to the maintenance of information, files and records generated by the State [sic] Street [sic] Task Force, including documents that pertain to access to those files and records by state law enforcement entities and prosecutors.
>
> c.  Any payments, deals, compensation or incentives known to have been offered or provided to any witnesses that testified for the prosecution in Thomas's federal trial, whether offered in connection with their cooperation in the investigation of the Walgreens robbery or for testimony at trial. The circumstances surrounding that transaction or offer, including the amount, date, location, legal foundation, source of money or authorization for the deal, process of approval, reason and date your agency came to know of each payment, deal or compensation.
>
> d.  Any payments, deals, compensation or incentives offered or provided to any witnesses that testified for the prosecution in Thomas's state trial, whether offered in connection with their cooperation in the investigation of the Walgreens robbery or for testimony at trial. The

circumstances surrounding that transaction or offer, including the amount, date, location, legal foundation, source of money or authorization for the deal, process of approval and reason for each payment, deal or compensation.

e.   Any and all payments, deals, compensation or incentives offered or provided to Angela Jackson in connection with the investigation of the Walgreens robbery and her subsequent testimony against Andrew Thomas in his state or federal trial.

f.   The individuals who interacted with Angela Jackson in connection with the investigation of the Walgreens robbery and her subsequent testimony against Andrew Thomas in his state and federal trials, including their present-day or last known contact information if available.

g.   The individuals who had a role in formulating, approving and offering the $750 payment to Angela Jackson in connection with her role in the investigation of the Walgreens robbery and subsequent testimony against Andrew Thomas during his federal trial.

h.   The monetary source(s) of the FBI's $750 payment to Angela Jackson in connection with her role in the investigation of the Walgreens robbery and subsequent testimony against Andrew Thomas during his federal trial.

i.   The legal foundation for the FBI's authorization of the $750 payment to Angela Jackson in connection with her role in the investigation of the Walgreens robbery and subsequent testimony against Andrew Thomas during his federal trial.

j.   Any and all legal foundations for your office to make payments to witnesses who cooperate with investigations or testify at trial, as well as the procedures or regulations governing the application for any such payment to be made and the individuals who are responsible for approving and distributing any such payment.

k.   All individuals who received payments from your office in connection with their cooperation with a

37

criminal investigation or trial during the years 1997-2001, including the legal foundation for making those payments and the present-day or last known contact information if available.

l.   All individuals who received payments from federal law enforcement authorities in Memphis in connection with their cooperation with a criminal investigation or trial during the years 1997-2001, including the legal foundation for making those payments and the present-day or last known contact information if available.

m.   All individuals who received payments from your office in connection with their cooperation with a criminal investigation or trial during the past three years (2009-present), including the legal foundation for making those payments and the present-day or last known contact information if available.

n.   All individuals who received payments from federal law enforcement authorities in Memphis in connection with their cooperation with a criminal investigation or trial during the past three years (2009-present), including the legal foundation for making those payments and the present-day or last known contact information if available.

o.   Any guidelines, criteria or memoranda maintained by your office that outline when and under what authority and process such a payment can and should be made to a witness in connection with their cooperation with a criminal investigation or trial, as well as the individual(s) responsible for supervising that process in 1998 and the individual who is presently responsible for supervising that process.

p.   Any guidelines, criteria or memoranda maintained by your office that outline the process or procedure under which your agency or state prosecutors would and can request information from federal law enforcement entities relating to upcoming criminal trials in state court.

q.   All documents in your possession relating to the FBI's $750 payment to Angela Jackson before

38

Thomas's state trial, as well as any individuals who were responsible for obtaining such information from the federal authorities in anticipation of that trial.

r.   Any and all impeachment and/or exculpatory evidence furnished to Thomas's counsel prior to his state trial.

s.   Any impeachment and/or exculpatory evidence that was not furnished to Thomas's counsel prior to his state trial. For all pieces of evidence listed, provide a full explanation for why that evidence was not disclosed to Thomas's counsel.

(ECF No. 25-2 at PageID 8080-8082 ¶¶ (B)(2)(a)-(s).)

The Court finds Thomas has not demonstrated why subpoenas to unspecified state law-enforcement agencies, personnel, and prosecutors would provide the information needed to support his claims. Testimony in the § 2255 proceeding indicated that the MPD, SCSD, and possibly an officer from the Collierville Police Department were involved in the Safe Streets Task Force, see supra p. 24. The proposed document requests are duplicative of the requests for the Safe Streets Task Force. For the same reasons stated supra pp. 32-34, Thomas's proposed document requests in ECF No. 25-2 ¶¶ (B)(1)(a), (B)(1)(c)-(e), (B)(1)(g), (B)(1)(k)-(*l*), and (B)(1)(o)-(p) are **DENIED**.

Thomas is, however, **GRANTED** leave to serve subpoenas on the MPD, the SCSD, and the Shelby County District Attorney to obtain documents described in the requests in ECF No. 25-2 ¶¶ (B)(1)(h)-(i); (B)(1)(m); (B)(1)(j); and (B)(1)(q) to the extent the requests are limited to witnesses who testified at the state trial; and

39

(B)(1)(b), (B)(1)(f), and (B)(1)(n) to the extent that the request is limited to the investigation of Thomas's case. Thomas's document requests are **DENIED IN PART** to the extent that the requests exceed the scope defined in the Court's Order.

Thomas has been granted discovery of documents from the MPD, the SCSD, and the Shelby County District Attorney, <u>see</u> supra pp. 39-40. At this time, however, Thomas has not presented sufficient factual information to establish good cause to take the depositions of unspecified state law enforcement agencies, personnel, and prosecutors. Thomas's request to take the depositions of state law enforcement agencies, personnel, and prosecutors (ECF No. 25-2 ¶ (B)(2)) is, therefore, **DENIED**.

### 3.  Angela Jackson

Thomas seeks leave to subpoena the following documents from Jackson:

a.  All documents and communications that refer to, reflect, or concern any payment(s) received by You from the Safe Streets Task Force.

b.  All documents and communications that refer to, reflect, or concern any interaction between You and the Safe Streets Task Force.

c.  All documents and communications that refer to, reflect, or concern any interaction between You and any federal or state government agency or employee, including but not limited to, the state and federal prosecutors, Memphis police department, and the Memphis office of the Federal Bureau of Investigation.

(ECF No. 25-2 at PageID 8082 ¶¶ (C)(1)(a)-(c).) The Court finds Thomas has demonstrated good cause for the documents and communications requested in ¶¶ (C)(1)(a)-(b) and ¶ (C)(1)(c) for documents and communications between Jackson and state government agencies, employees, and prosecutors and the MPD. Accordingly, the requests in ¶¶ (C)(1)(a)-(b) are **GRANTED**. The request in ¶ (C)(1)(c) is **GRANTED IN PART,** to the extent Thomas seeks documents and communications between Jackson and state agencies and prosecutors, and **DENIED IN PART,** to the extent Thomas seeks documents and communications between Jackson and federal entities.

Thomas proposed the following areas of inquiry for the Jackson deposition:

a.  Any contact between you and any law enforcement officer with regard to the Walgreens robbery, including when that contact occurred, who those officers were, where you were, and what you discussed.

b.  All conversations you had with U.S. Marshal Scott Sanders relating to the Walgreens robbery, including where possible, the dates or approximate dates of those conversations, where you spoke and what you discussed.

c.  The extent to which any federal or state officer ever told you that you may have criminal liability based on your conduct in connection with the Walgreens robbery, including who told you that, and what was said in the conversation.

d.  The extent to which any federal or state officer ever told you that you could avoid prosecution for anything you did in connection with the Walgreens robbery if you cooperated with the investigation of the robbery, or testified against Andrew Thomas or Anthony Bond at trial, including who told you that, and what was said in the conversation.

41

  e. All offers of compensation, payment, reward or any other deal that you received in connection with the investigation of the Walgreens robbery or your testimony against Andrew Thomas in either his federal and state trials. State whether those offers were made before or after your testimony, what you had to do to receive the benefit of the offer, which offers you actually accepted, and what you actually received as a result.

  f. Any and all meetings you had with state and federal law enforcement agents and prosecutors after you testified in Andrew Thomas's federal trial.

  g. All circumstances surrounding your receipt of the $750 payment from the FBI in December 1998. State what did you do to earn that payment, when did you learned [sic] that the payment was going to be made, who paid you the money, and where did you go to claim the money.

  h. What you did with the $750 that was paid to you by the FBI, including when and where you spent the money.

  i. Whether you were paid any additional funds other than the $750, including, if applicable, how much, what you did to earn the payment, when you learned the payment was going to be made, who paid you the money, and where you went to claim the money.

  j. Your yearly income for each year from 1997 through 2001, as well as the sources of that income.

  k. Any debt you carried above $500 for any part of the years 1997 through 2001. Describe the origin of that debt, as well as if and how you discharged it, and the source of the money you used to pay it off.

(ECF No. 25-2 at PageID 8083 ¶¶ (C)(2)(a)-(k).)

  The Court finds Thomas has demonstrated good cause to take Jackson's deposition to support his <u>Brady</u> and false-testimony claims. The proposed areas of inquiry in ECF No. 25-2 ¶¶ (C)(2)(h) and (C)(2)(j)-(k), however, are irrelevant to Thomas's habeas

claims, and Thomas has not demonstrated good cause to address this subject matter in a deposition. Accordingly, Thomas's request is **DENIED IN PART** to the extent he may not address the proposed areas of inquiry at ECF No. ¶¶ (C)(2)(h) and (C)(2)(j)-(k). Thomas's request is **GRANTED IN PART** to the extent Thomas's counsel may take Jackson's videotaped deposition limited to the proposed areas of inquiry identified at ECF No. 25-2 ¶¶ (C)(2)(a)-(g) and (C)(2)(i) before the Court within sixty (60) days of the entry of this Order. Counsel shall schedule the deposition with the Court's case manager.

      **IT IS SO ORDERED,** this 30th day of September, 2013.


                              /s/ Jon P. McCalla
                              U.S. DISTRICT COURT JUDGE