IN THE UNITED STATE DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | | |
|---|---|---|
| ANDREW THOMAS, | ) | |
| | ) | |
| Petitioner, | ) | Electronically Filed |
| | ) | |
| | ) | |
| vs. | ) | No. 2:12-cv-02333-JPM |
| | ) | |
| | ) | CAPITAL CASE |
| WAYNE CARPENTER, Warden, | ) | |
| Riverbend Maximum Security | ) | |
| Institution | ) | |
| Respondent. | ) | |

---

**PETITIONER'S RESPONSE TO THE
WARDEN'S MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Petitioner, Andrew Thomas, ("Petitioner" or "Thomas") respectfully asks that the Court deny the Motion for Summary Judgment on Thomas's Petition for Writ of Habeas Corpus filed by Respondent Warden Wayne Carpenter ("Motion").  As explained below, the Respondent has not met his burden of establishing that he is entitled to judgment as a matter of law on any of Petitioner's claims.

## II.     STANDARD OF REVIEW

Summary judgment is proper only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  All evidence and reasonable inferences are viewed in the light most favorable to the party opposing the motion. *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 759 (6th Cir.2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986)).

A federal habeas court reviews previously unadjudicated mixed claims of fact and law, such as claims brought under *Brady v. Maryland*, 373 U.S. 83 (1963), *de novo*, and reviews purely factual findings only for clear error.  *Cone v. Bell*, 556 U.S. 449, 472 (2009) ("because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA….Instead, the claim is reviewed *de novo*."); *Williams v. Coyle*, 260 F. 3d 684, 691 (6th Cir. 2001).

To obtain relief on claims that a state court has previously adjudicated, a habeas petitioner must meet the requirements of 28 U.S.C. § 2254(d).  Specifically, a petitioner must show that the state court's determination either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).  In reviewing previously adjudicated claims, habeas courts are limited to the record that was before the state court.  *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011). However, the majority in *Cullen* agreed that a hypothetical petitioner described in Justice Sotomayor's dissent who diligently attempted to develop the factual basis of a *Brady* claim in state court, was denied relief, and then subsequently discovered new evidence relating to the *Brady* claim "may well present a new claim" such that he could obtain federal habeas review. 131 S.Ct. at 1401-02, n.10.

Courts in this Circuit have held that, if after reviewing the state court record, the reviewing court finds that the state court unreasonably decided the disputed claim under § 2254(d), the reviewing court may consider new evidence.  *Caudill v. Conover*, 871 F. Supp. 2d 639, 649(E.D. Ken. 2012) ("if after review solely on the state-court evidence, it appears the state court contravened or unreasonably applied clearly established federal law, the federal court may then consider additional evidence to determine whether habeas relief should be granted") (collecting cases); *Conway v. Houk*, No. 2:07-cv-947, 2011 WL 2119373, at *3 (S.D. Ohio May 26, 2011).

## III.   ARGUMENT

### A.   Claims No. 1 and 2:  The State Violated Thomas's Constitutional Rights By Failing To Comply With Its Discovery Obligations Under *Brady v. Maryland* And By Presenting Angela Jackson's False Testimony

The Petitioner was unable to raise the *Brady* and false testimony claims before the state courts because the State failed to disclose that a $750 payment was made to its key witness, Angela Jackson, until 2011, two months after the close of Petitioner's state court proceedings. Therefore, the Court must review these claims *de novo*.  The Respondent's Motion as to these

two claims should be denied because he has failed to demonstrate that he is entitled to a judgment as a matter of law that the State did not violate its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the payment to Jackson and failing to correct Jackson's false testimony concerning that payment under *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959).[1]

### 1. The State Had A Duty To Disclose The Information Regarding The Payment To Thomas's Attorneys At The Time Of His State Trial

In November 1998, United States Marshal Scott Sanders—a member of the joint state and federal Safe Streets Task Force that investigated the Walgreen's robbery and shooting underlying Thomas's conviction— sought authorization from the FBI for a payment of $750 to Angela Jackson (Thomas's ex-wife) after her testimony in Thomas's federal trial. In fact, this payment was not disclosed at the time of Thomas's state court trial almost two years later, in late 2000. The FBI made this payment to Jackson, witnessed by Marshal Sanders, in December 1998. This payment was not disclosed until October 2011, two months after Thomas's state-court appeals had concluded. The State argues that it was not obligated to inform Thomas's state trial counsel about the payment because the federal government allegedly possessed this information and the federal government is a separate entity for purposes of a *Brady* analysis. In making this assertion, however, the State notably fails to identify a single case taking this position in the context of a joint state-federal investigation. Instead, the State cites *Sutton v. Bell*, No. 3:06-cv-388, 2011 WL 1225891, *14-15 (E.D. Tenn. Mar. 30, 2011) for the proposition that

---

[1] Petitioner submits that the evidence in the record conclusively establishes that the State violated *Brady v. Maryland* and *Giglio v. United States* and that he is actually innocent. To the extent that the Respondent challenges the evidence in the record, Petitioner filed a motion seeking an evidentiary hearing on Claims 1, 2, and 3 of the Petition [Dkt. No. 66] on April 17, 2014, which is still pending before this Court.

"a petition must show that an individual member of the prosecution team withheld *Brady* material." Mot. at 28.

But, *Sutton*, which did not involve a joint investigation of a single crime by federal and state law enforcement, bears no resemblance to this case. In *Sutton*, the petitioner asserted a *Brady* violation based on the state prosecutor's failure to disclose a wholly separate investigation of a forensic pathologist who testified regarding the victim's time of death. The record in that case established that the impeachment evidence was in the possession of agents from the Tennessee Bureau of Investigation "with no connection or involvement in the investigation of Petitioner's case." *Id.* at *13. The *Sutton* court defined the "prosecution team" as including "both the investigators and prosecutors." *Id.* at *10, n.17 (citing *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989). Thus, the court concluded that, "[i]n order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Id.* at *14 (quoting *Strickler v Greene*, 527 U.S. 263, 280-81 (1999)).

More importantly, however, the federal agents that paid Angela Jackson were involved in the investigation and prosecution of Mr. Thomas. Here, the state prosecutor had a duty to learn of all favorable evidence known by *any members* of the Safe Streets Task Force (including federal agents) who were investigating the Walgreens robbery and shooting, as these agents were all acting jointly on behalf of both the state and federal governments. This is borne out by the record facts regarding the composition, policies, and procedures of the Safe Streets Task Force. In 1997, the Safe Streets Task Force was a "multi-jurisdictional," "multi-agency task force" comprised of approximately 12 "officers, investigators from the Memphis Police Department, the Shelby County Sheriff's Department, the Federal Bureau of Investigation and the U.S.

Marshal Service" tasked to investigate bank robberies in Memphis, Tennessee.  Dkt. 12-19 at PageID 2100-01 (Testimony of MPD Officer Chad Golden, State Trial Tr. (9/20/01) at 957:20-958:6); Dkt. 24-1 at PageID 7929 (Decl. of Robert L. Hutton in Supp. of Pet.'s Reply in Supp. of Pet. for Writ of Habeas Corpus);  Dkt. 24-1 at PageID 7932-34 (Testimony of DUSM Scott Sanders, § 2255 H'rg Tr. (10/12/11) at 221:25-222:15, 222:25-223:19); Dkt. 24-2 at PageID 7941 (Testimony of DUSM Scott Sanders, § 2255 H'rg Tr. (10/13/11) at 297:15-20).   The Memorandum of Understanding ("MOU") governing the Safe Streets Task Force is explicit that the Task Force's purpose is to establish "a joint cooperative effort" between state and federal law enforcement, "foster an efficient and cohesive unit," and "achieve maximum inter-agency cooperation in a combined law enforcement effort."   Dkt. 58-7 at Page ID 8896-8904.  Additionally, the policies and procedures of the Safe Streets Task Force were decided by an Executive Board composed of both state and federal officials, and the Task Force and state and federal prosecutors met periodically to decide whether its investigations should be prosecuted by the state or federal government.  *Id.* ("the jurisdiction will be resolved through discussion among all investigative agencies and prosecutive agencies having an interest in the matter").

The record clearly establishes that the Safe Streets Task Force was solely responsible for conducting the investigation into the Walgreens robbery and shooting, and the State of Tennessee ultimately prosecuted the case.  *See* Dkt. 15-1 at PageID 7845-46 (Sanders Decl. at ¶¶ 1-2, FBI form containing request for payment);  Dkt. 24-1 at PageID 7932-33; 7937 (Testimony of DUSM Scott Sanders, § 2255 H'rg Tr. (10/12/11) at 221:21-222:5; 241:9-23); Dkt. 24-2 at PageID 7942-43 (Testimony of DUSM Scott Sanders, § 2255 H'rg Tr. (10/13/11) at 298:20-23, 305:14-24); Dkt. 12-19 at PageID 2101-02 (Testimony of MPD Officer Chad Golden, State Trial Tr. (9/20/01) at 958:7-959:6).   Furthermore, Marshal Sanders was assigned as the "the lead

officer" on the Walgreens robbery and shooting.  Dkt. 12-19 at PageID 2101-02 (Testimony of

MPD Officer Chad Golden, State Trial Tr. (9/20/01) at 958:18-959:6);  Dkt. 24-1 at PageID

7932-33; 7935 (Testimony of DUSM Scott Sanders, § 2255 H'rg Tr. (10/12/11) at 221:21-222:5,

224:4-13).  Critically, as the lead agent, Marshal Sanders "would have had knowledge of and

custody of all investigative reports and items of evidence in the case."   Dkt. 15-1 at PageID

7845-46  (Sanders Decl. at ¶ 2)).

The FBI also played a significant role in the Safe Street Task Force's investigation of Mr.

Day's shooting and robbery:  of the 12 Safe Streets Task Force members assigned to this crime,

at least four of them were from the FBI.  *See*  Dkt. 24-1 at PageID 7934 (Testimony of DUSM

Scott Sanders, § 2255 H'rg Tr. (10/12/11) at 223:3-19).  More importantly, the FBI was

responsible for coordinating the Safe Streets Task Force and had supervisory authority over it,

which included assigning cases, reviewing reports, investigating documents, conducting file

reviews, and—most critically to this case—*approving task force expenditures*.  *See id.* at

PageID 7934-35.

Thus, the evidence obtained to date makes it clear that both the state and federal members

of the Safe Streets Task Force were members of the "prosecution team."  Consequently, the State

had a duty to learn of any favorable evidence known to *any member* of the Safe Streets Task

Force.  Federal appellate courts have consistently reached this same conclusion and treated

federal agencies as part of a prosecutorial team when federal and state entities pool their

resources in a joint investigative effort.  For instance, *United States v. Antone* involved an

investigative task force comprised of FBI agents and state investigative agents from the Florida

Department of Criminal Law Enforcement ("FDCLE") that was convened to investigate the

murder of a local police officer.  *See United States v. Antone*, 603 F.2d 566, 568 (5th Cir. 1979).

The FDCLE agents provided benefits to a witness in the form of attorneys' fees. There was no evidence of these payments in the FDCLE investigative file made available to the federal agents, and these payments were not otherwise disclosed to the federal agents. *See id*. Nevertheless, the Fifth Circuit held that the "extensive cooperation" between the FDCLE and the FBI to investigate the crime "convinces us that the knowledge of the state team that Haskew's lawyer was paid from state funds *must be imputed*" to the federal prosecutors. *Id*. at 570 (emphasis added). "[F]ederal and state sovereignty overlap in many respects. Imposing a rigid distinction between federal and state agencies which have cooperated intimately from the outset of an investigation would artificially contort the determination of what is mandated by due process." *Id*.

Other courts have followed *Antone*'s lead and held that knowledge of a state or federal agency must be imputed across jurisdictional lines in cases where there was a cooperative effort between the federal and state governments. *See, e.g., Hays v. Alabama*, 85 F.3d 1492, 1497 n.2 (11th Cir. 1992) (imputing knowledge of statements in possession of federal agents to the state "based on the level of cooperation between the state prosecutors and the FBI."); *United States v. Risha*, 445 F.3d 298, 302 (3d Cir. 2006) ("[I]f a team or joint investigation did exist here, or if any state agent was acting on behalf of the federal government, the federal prosecutor may be charged with the knowledge of the state Attorney General's Office."); *United States v. Leos-Hermosillo*, 213 F.3d 644, 2000 WL 300967, at * 3 (9th Cir. Mar. 22, 2000) (holding that even though an officer was a member of the San Diego Police Department and "was not employed by a department or agency of the federal government, he was no less an agent of the federal government; he was acting on its behalf and subject to its control."); *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 896 (D.C. Cir. 1999) ("[W]e reject as irrelevant the

contention that the requested records may have been in the possession of the Metropolitan Police Department, or the FBI or DEA, rather than the U.S. Attorney's office" based on the close working relationship between the entities on the case); *United States v. Brooks,* 966 F.2d 1500, 1503 (D.C. Cir. 1992) ("Given the close working relationship between the Washington metropolitan police and the U.S. Attorney for the District of Columbia (who prosecutes both federal and District crimes, in both federal and Superior courts), a relationship obviously at work in this prosecution, the duty must reach the police department's homicide and Internal Affairs Division files.").

Here, the state prosecutors, who were assigned to prosecute the case as the result of a joint state-federal decision, had an obligation to learn of any *Brady* material in the possession of any members of the Safe Streets Task Force, which included evidence of the $750 payment, as a matter of law.   Without such a requirement, state and federal governments would be free to circumvent their *Brady* obligations when conducting joint investigations by withholding exculpatory and impeachment evidence from other members of the investigation and prosecution teams, which would clearly violate the purpose and spirit of the *Brady* rule.  *See United States v. Antone*, 603 F.2d at 570.

**2.  The State Has Not Established That The Payment To Jackson Was Not Material**

The Respondent also argues that Petitioner has not shown the required elements of a *Brady* violation; namely, that the evidence of the payment is material.  Mot. at 29.  Evidence is material if it "might have persuaded one or more jurors" to change their decision.  *Cone v. Bell*, 556 U.S. 449, 475 (2009).   Supreme Court precedent establishes that information about government payments to key fact witnesses plainly constitutes material evidence that the prosecution is required to disclose before trial under *Brady*.  *See Banks v. Dretke*, 540 U.S. 668,

671 (2004); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *see also Robinson v. Mills*, 592 F.3d 730 (6th Cir. 2010) (holding that suppressed impeachment evidence that the government's key witness was a paid informant was material).[2]

The Respondent contests that the payment to Jackson was not material because there is no connection between Jackson's testimony in Petitioner's federal and state trials. However, Jackson had a clear motive to make her state-trial testimony against Thomas consistent with her testimony in his federal trial: to avoid exposing herself to perjury charges. In essence, from the very first moment that Jackson spun her story implicating Thomas in the Walgreens robbery and shooting, she became committed to this story, and she therefore was bound to repeat it or else expose herself as a liar. With regard to Jackson's initial statement to investigators prior to her testimony in either trial, it would have been reasonable for the jury to draw the conclusion that Jackson understood that she would be paid after her federal trial testimony if she inculpated Thomas. It simply defies reason to assume that the FBI would issue a gratuitous payment of $750 to a key fact witness without any prior discussion or insinuation.

Regardless of whether the $750 payment affected Jackson's testimony at Thomas' state trial, her testimony in that proceeding denying that she received payment makes the fact of that payment impeachment evidence. It is simply incredible that Jackson did not recall being paid $750, the equivalent of two weeks' of her wages, only three years afterward. Dkt. 54 at PageID 8311-12 (Jackson Tr. 37:23-38:14). Therefore, it would have been reasonable for the jury to infer that Jackson was lying when she testified at the state trial that she did not receive such

---

[2] It is also worth noting that $750 in 1998 is equivalent to approximately $1,060 in 2013. Further, Jackson testified that her hourly wage in 1998 was approximately $7 per hour and her gross salary was approximately $1,130 per month. Dkt. 54 at PageID 8311-12 (Jackson Tr. 37:23-38:14). Therefore, $750 would have been the equivalent of more than two weeks' wages for Jackson at the time she was paid this sum after her testimony.

payment.  The Respondent's argument that Jackson understood the word "reward" to refer to payment from the bank (Dkt. 54 at PageID 8316 (Jackson Tr. 42:13-21)) simply does not make sense on its face.  The Oxford Dictionary defines "reward" as "a thing given in recognition of one's service, effort, or achievement."[3]  When Jackson was asked at the state trial whether she received any "reward money" in the context of discussing the FBI agents' visit to her house in November 1997, the only reasonable interpretation of that question would have been whether she received something in recognition of her assistance with the FBI's investigation and her related testimony at the federal and state trials.

The Respondent argues that disclosing the fact that Ms. Jackson had received $750 in connection with her federal testimony—the substance of which she then repeated in her state testimony—would not have affected the jury "in the light of the eyewitness accounts and video evidence showing Thomas committed this murder and robbery, and the fact that he bought a car and, with Jackson's assistance, used the proceeds the defendant gave her from the offense to open a banking account two days later."  Mot. at 29.  However, the *only* eyewitness identification of Thomas came from Richard Fisher—who first identified two other individuals as the perpetrator before, at the urging of Bond's counsel, settling on Thomas.[4]  *See* Dkt. 12-19 at PageID 2038-39; 2053; 2062-67.  The evidentiary value of the video evidence is dependent on Jackson's credibility, as the image on the video was so poor and obscured that the State did not dare let the jury draw its own conclusions, but rather, needed Jackson to identify the individual seen in the video.  *See* Dkt. 12-17 at PageID 1754; 1816-18 (State Trial Tr. at 670:7-21; 731-

---

[3] Oxford Dictionary, *available at*
http://www.oxforddictionaries.com/us/definition/american_english/reward.
[4] Further, the record shows that another eyewitness, Robert Fisher, testified that he looked inside the getaway car leaving the scene of the robbery and shooting and did not see Thomas.  Dkt. 59-3 at PageID 9408; 9413; 9420 (Federal Trial Tr. (11/10/98) at 594:3-11, 599:14-25, 606:16-25).

733); Dkt. 1-10 at PageID 174-75 (State Ex. 18).   Finally, the fact that Jackson opened a bank account with proceeds from the robbery or with money given to her by Thomas is evidence that came solely from Jackson and, therefore, is also dependent on her credibility.  *See*  Dkt. 12-17 at PageID 1725-30; 1733; 1735; 1739-47; 1753; 1803; 1805 (State Trial Tr. at 641-46, 649, 651, 655-59, 660-63, 669, 719, 721).

Jackson's testimony was the State's key evidence against Thomas and, thus, the fact that the federal government paid Jackson $750 after her testimony in the federal case, which was consistent with her testimony in the state case, and that she lied about this payment during her testimony in the state case, is material.

### 3.   Respondent Has Not Established That It Is Entitled To Summary Judgment Relating To Petitioner's False Testimony Claim

In support of its Motion with respect to Thomas's false testimony claim, Respondent argues that Jackson's denial of receiving payment was not *knowingly* false because she recently testified that she does not presently recall receiving the payment.  Mot. at 30.  Jackson's apparent memory failure at the present time is irrelevant to the question of whether her testimony, without which, according to Marshal Sanders, "Thomas would not have been successfully prosecuted," was actually false, which has been established by the evidence—the receipt that she signed acknowledging that she received a payment of $750.  *See* Dkt. 58-7 at PageID 8843; Dkt. 15-1 at PageID 7852.

With respect to the elements of materiality and the prosecution's knowledge of the falsity, the Respondent simply refers to its earlier arguments regarding the *Brady* claim, which as explained above, do not entitle the Respondent to summary judgment.  Additionally, the Sixth Circuit has recognized that there may be circumstances (such as those presented here) in which a prosecutor "should have known" about perjured testimony.  *See*, *e.g.*, *Macon v. Davis*, 450 Fed.

Appx. 491, 2011 WL 6091562 (6th Cir. Dec. 7, 2011) *cert denied*, 132 S. Ct. 2383 (2012) (defendant must show that the prosecutor "knew or should have known" of falsity); *Foley v. Parker*, 488 F.3d 377, 392 (6th Cir. 2007) (standard for knowing use of false testimony is the prosecution "knew or should have known" of perjury).   Whether a prosecutor "should have known" that testimony was false is a fact-driven inquiry that courts conduct on a case-by-case basis.   *See*, *e.g.*, *U.S. v. Hicks*, 495 Fed. Appx. 633 (6th Cir., 2012).   During the course of discovery,  FBI Agent Joel Siskovic, Chief Division Counsel, Supervisory Special Agent, FBI Memphis) revealed that it was a common practice for the Safe Streets Task Force to pay fact witnesses, just as it did with Jackson in this case.   *See* Dkt. 66-1 at PageID 11873-74 (Aff. of Robert Hutton in Supp. of Pet.'s Mot. For Evidentiary Hearing).   This common practice indicates that the prosecutors, who frequently worked with the Safe Streets Task Force, *should have known* that a payment to a key witness would likely have been made in Thomas' case.

Thus, the Respondent is not entitled to summary judgment on Petitioner's *Brady* and false testimony claims.

**B.      Claim No. 3:  Thomas Is Actually Innocent Of Day's Felony Murder**

Contrary to the Respondent's arguments, Thomas has made a sufficient showing that he is actually innocent .  The Supreme Court has announced that the "execution of a legally and factually innocent person would be a constitutionally intolerable event." *Herrera v. Collins*, 506 U.S. 390, 419 (1993) (O'Connor, J., concurring); *see also id*. at 430 (Blackmun, J., dissenting) ("Nothing could be more contrary to contemporary standards of decency, or more shocking to the conscience, than to execute a person who is actually innocent." (internal citations omitted)). To obtain relief for a claim of actual innocence, the petitioner must make a "truly persuasive demonstration" of actual innocence based upon "'all the evidence' . . . without regard to whether

it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House v. Bell*, 547 U.S. 518, 537-38, 554 (2006) (quoting *Herrera*, 506 U.S. at 417, and *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)).

The Respondent argues that Thomas's claim of actual innocence is procedurally defaulted because he "waited nearly five years to raise a claim based on his evidence in state court." Mot. at 33. However, this argument ignores the fact that Thomas can show cause and prejudice for his failure to raise this claim in state court: he did not know the information about the payment to Jackson during the state court proceedings through no fault of his own. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) (a habeas petitioner can show cause when the "factual or legal basis of a claim was not reasonably available to counsel."). Thomas has clearly met this standard here, where he learned of the payment to Jackson two months *after* his state court proceedings had concluded and there is certainly a reasonable probability that disclosure of the payment to the jury would have caused at least one juror to have a reasonable doubt of guilt. Thus, this new evidence should be considered in relation to Thomas's actual innocence claim.[5]

The Respondent's argument that Petitioner's false testimony claim must fail is based on the assumption that Jackson's testimony at Thomas's trials was true, which, as discussed above, has been undermined by the recent revelation of the payment and Jackson's denial thereof. The State relies on Marshal Sanders' declaration to establish that no one made any pre-trial promises to Jackson regarding payment. However, Marshal Sanders' testimony is not

---

[5] Further, even if the Respondent's argument had some merit, it is well-established that new evidence of actual innocence (as Petitioner has here) can be a "gateway" through which a habeas petitioner can have his otherwise-barred constitutional claim considered on the merits. *Herrera*, 506 U.S. at 404.

undisputed, as he has not been cross-examined and, thus, it is not a sufficient basis on which to grant summary judgment.

Additionally, the letter from Anthony Bond should be considered in support of Petitioner's actual innocence claim under the standard articulated above, which requires that "all the evidence" of actual innocence be considered, as well as in light of the newly discovered evidence regarding the payment to Ms. Jackson. *House*, 547 U.S. at 537-38. The state post-conviction court found that Bond wrote this letter, a fact that was uncontested by the State at the evidentiary hearing. *See* PC-Crim. Ct. Op. at 51. Nevertheless, the state court found Jackson's testimony "compelling" and declared the letter "highly suspicious" (despite finding that Bond wrote the letter), and noted that Thomas pointed to "nothing to corroborate its truthfulness." *Id.* at 49-50. The state post-conviction courts at both the trial and appellate level relied entirely on Jackson's testimony in disregarding the Bond letter and finding Thomas's guilt. PC-Crim. Ct. Op. at 50-51; PC-CCA Op. at 46. But the state courts never heard evidence of the FBI's $750 payment to Jackson in exchange for her testimony, nor were they aware of the fact that she perjured herself in denying this payment. Now that this evidence has finally been brought to light, there can be no question that the credibility and strength of Jackson's testimony is, at a minimum, greatly diminished, and the Bond letter should be re-evaluated accordingly.

Finally, it is clear that legal innocence is a ground on which habeas relief can be granted in the absence of procedural default. *Jackson v. Virginia*, 443 U.S. 307, 321 (1979). As explained above, Thomas's claims of legal (as well as actual) innocence are not procedurally defaulted because he can show cause and prejudice for his failure to raise them in

state court.  As a result, his claim of legal innocence must now be reviewed by the habeas court.

### C.    Claim No. 4:    The State Courts Unreasonably Applied Supreme Court Jurisprudence In Determining That Thomas Was Not Denied Effective Assistance Of Counsel In The State Court Proceedings

The Respondent is not entitled to summary judgment on Thomas's ineffective assistance of counsel claim.  Rather, the facts show that, contrary to federal law, Thomas was deprived of effective assistance of counsel throughout his trial, and it is reasonably likely that the jury would have returned a different verdict had Thomas' counsel performed competently.  Contrary to the Respondent's conclusory assertions, and as explained further below, the Tennessee Court of Criminal Appeal's adjudication of Thomas's ineffective assistance of counsel claims resulted in decisions that contravened clearly-established federal law and were based on an unreasonable determination of the facts in light of the evidence presented in state court.

Federal law provides that "the right to counsel is the right to the effective assistance of counsel."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citations omitted).  *Strickland* sets forth two elements that must be shown in order to succeed on an ineffective assistance of counsel claim: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defendant.  *See id*. at 687.  Counsel's performance is deficient if it falls below an objective standard of reasonableness, as defined by prevailing professional norms.  *Id*. at 687-88, 690; *Wiggins v. Smith*, 539 U.S. 510, 522 (2003).  Deficient performance will be deemed prejudicial if, but for counsel's error, there is "a reasonable probability that at least one juror would have struck a different balance." *Id.*, 539 U.S. at 513,537.  If counsel's performance is both deficient and prejudicial, a new trial is warranted. *See Strickland*, 466 U.S. at 686.

At trial, the court appointed Michael Scholl and Jeffery Glatstein as Thomas' attorneys. On appeal, Scholl and Robert Brooks represented Thomas. The undisputed facts show that, contrary to the state courts' determinations, Scholl, Glatstein, and Brooks did not effectively represent Thomas at any stage in his case; therefore, there is no basis on which to grant the Respondent summary judgment.

> **1.    The State Courts' Decisions That Trial Counsel's Failure To Present A Medical Causation Defense Was A Reasonable Strategic Decision Unreasonably Applies Supreme Court Precedent**

One of the critical issues at trial was whether the gunshot wound to the victim, Day, ultimately caused his death from a bladder infection two-and-a-half years later.   Scholl acknowledged that this issue was critical, because if Day's death was not caused by the gunshot, then Thomas could not be convicted of felony murder. *See* Dkt. 14-12 at PageID 6094-95.

However, Thomas' trial counsel did not consult with an appropriate expert who was qualified to opine on the cause of Day's paralysis and eventual death.  Scholl, by his own admission, delegated this critical responsibility to his co-counsel, Glatstein, and to Howard Manis, who represented Thomas' co-defendant Anthony Bond. *See* Dkt. 14-11 at PageID 5982; Dkt. 14-12 at PageID 6097'.  However, Glatstein stated during Thomas's post-conviction evidentiary hearing that he was "wrapping up" his criminal practice at this time in preparation for a master's program in accounting and tax.   Dkt. 14-10 at PageID 5682.  Glatstein also testified that *during* Thomas's trial, he focused all his energies on his studies, not on Thomas's defense.  *Id.*   By his own admission, Glatstein testified that he did not independently contact a medical expert and that he had no recollection of talking to *any* medical expert at all. *See id.* at PageID 5679.  Instead, Glatstein admitted that he was merely "riding [the]

coattails" of Manis, Bond's counsel. *See id*. at PageID 5695. Manis also did not consult with an expert qualified to determine the cause of Day's death, despite receiving advice to this effect from Dr. Steven Hayne, the Chief Medical Examiner of Mississippi and a forensic pathologist.

The state courts excused Scholl's failure to consult with a neurologist, finding that Scholl had conducted a reasonable investigation in making his strategic decision not to consult or call an expert witness since Manis had apparently told him that the doctors that Manis consulted would not be helpful to Thomas' case. The state courts' holding is an unreasonable application of established Supreme Court precedent concerning what constitutes a reasonable investigation that would support a strategic decision. The Supreme Court and United States Courts of Appeals have consistently held that where the resolution of a critical legal issue in a criminal case depends on expert evidence, counsel's failure to consult with a qualified expert constitutes deficient performance—especially where counsel knows that there is reason to question the validity of the State's evidence on that issue. *See*, *e.g.*, *Richey v. Bradshaw*, 498 F.3d 344, 362-64 (6th Cir. 2007) (where scientific evidence of arson was "fundamental" to the State's case and counsel knew that there were gaps in the State's proof, counsel's strategy merely to "poke holes" in the State's case without the benefit of an expert was deficient); *see also Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) (where the defense theory was that defendant did not commit the murder and a police report indicated that there were antigens in the blood sample that were inconsistent with the victim's blood type, failure to consult with a serologist constituted deficient performance).

The state court also wrongly found that Thomas was not prejudiced by trial counsel's failure to consult with an expert regarding causation. Under *Strickland*, to prove prejudice, Thomas is required to demonstrate a "reasonable probability" that, but for counsel's errors, the

State would have failed to prove any necessary element of its case against him. *Strickland*, 466 U.S. at 694 (describing the prejudice inquiry as whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").  However, Scholl and Glatstein did not present a single witness to challenge the State's case on causation and Scholl  failed  to  cross-examine  Dr.  Smith  and  Dr. Gardner a t  t r i a l  with  any  medical  records,  even  though  the  records  contradicted  the  doctors' theory of causation.   As a result, the jury heard uncontroverted testimony from both of the State's experts that the gunshot wound caused Day's death, and did not hear any rebuttal testimony.

Under *Strickland*, the central question in the prejudice inquiry is whether there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 513, 537.   The undisputed facts show that if  Thomas' trial counsel  had  consulted with  a qualified expert in the field of neurology, like Dr. Steven Horowitz, the neurology expert who  testified  at  Thomas's  post-conviction  evidentiary  hearing,  they  could  have  created reasonable doubt in at least one juror's mind as to the proximate cause of Day's death.   As such, the state court's determination that Thomas was not prejudiced by trial counsel's failure to consult an expert was contrary to, and an unreasonable application of, established federal law regarding prejudice resulting from ineffective assistance of counsel.

### 2.   Glatstein's *De Facto* Withdrawal And Scholl's *De Facto* Solo Representation Resulted In Ineffective Assistance of Counsel

The  Respondent  argues  that  Petitioner  has  not  alleged  a  specific  example  as  to  a deficiency that resulted from having only one attorney represent him.  However, as discussed above, the Petitioner has clearly demonstrated the fact that, in reality, Scholl represented Thomas as a solo attorney due to Glatstein's *de facto* withdrawal from the case severely and prejudicially

damaged Thomas's defense and therefore rendered Thomas's representation ineffective, contrary to the state courts' findings. *See*, *e.g.*, American Bar Association ("ABA") Guideline for the Appointment and Performance of Defense Counsel in Death Penalty Cases 4.1 (2003) (recommending that a capital defense team should consist of no fewer than two attorneys).  Had Glatstein been properly engaged in Thomas's defense, or, had Scholl alerted the court to the situation and sought a replacement second-chair counsel, the defense team might have properly investigated the medical causation defense and consulted with a qualified expert in the field of neurology, like Dr. Horowitz.  Proper investigation would have increased the likelihood that they would have been able to create reasonable doubt as to whether Day's gunshot wound was the proximate cause of his death.

>
> **3.      The State Courts Unreasonably Excused Trial Counsel's Failures Regarding The Admission And Use Of Bond's Confession Against Thomas**

In the 'his Motion for summary judgment on claims arising from the improper introduction of Anthony Bond's confession, Respondent rests exclusively on the finding of the state appellate courts that the constitutional errors were, in fact, permissible strategic choices by Thomas's counsel. But that conclusion is directly contrary to the established precedent of the Supreme Court. Counsel is demonstrably ineffective when a strategic decision is based on an plainly incorrect interpretation of the law. That is precisely what happened with Thomas's trial counsel.

In his post-conviction proceedings, Thomas argued that the following errors by his trial counsel regarding introduction and use of his co-defendant Bond's redacted confession constituted ineffective assistance of counsel under *Strickland*:  (1) Scholl failed to object to the introduction of Bond's confession at trial despite the fact that even as redacted, Bond's

confession implicated Thomas as the shooter in the Walgreens robbery in violation of *Bruton v. United States*, 393 U.S. 123 (1968); (2) Scholl failed to object to the State's repeated use of Bond's confession during its closing argument as proof of Thomas's participation and role in the Walgreens robbery; and (3) Scholl failed to request that a limiting instruction be given to the jury that Bond's confession could not be considered as evidence against Thomas, or to object to the court's failure to issue any such instruction. Despite finding that the admission of the improperly redacted confession violated Thomas' constitutional rights and that Scholl's performance was deficient, the state courts denied relief on all of these claims, finding these errors harmless. However, these failures, viewed individually or collectively, not only resulted in a violation of Thomas's right of confrontation and his right to effective assistance of counsel, but also deeply prejudiced his defense under clearly established federal law.

The undisputed facts show that the Court wrongly excused Scholl's failure to object to the State's unconstitutional use of the confession against Thomas, improperly reasoning that Scholl made a "tactical decision" to leave the description of the accomplice's clothing in the statement to "amplify the inconsistencies" of the various descriptions of the shooter. PC-CCA Op. at 35.

The Supreme Court has interpreted the Sixth Amendment as requiring counsel to conduct a "reasonable investigation[]" into the facts and law of each case. *Strickland*, 466 U.S. at 688, 690-91. If counsel makes a tactical or strategic decision is unreasonable based on a failure to research or understand the law, it will be found unreasonable. *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (rejecting the "justifications" given by counsel for his failure to file a timely suppression motion because they "betray a startling ignorance of the law"). Additionally, if counsel employs a trial strategy that is unreasonable given the facts of the case, and his failure to thoroughly investigate and understand the applicable facts is due to

"inattention" rather than a "reasoned strategic judgment," then the court must find deficiency. *See Rompilla v. Beard*, 545 U.S. 374, 396 (2005); *Wiggins*, 539 U.S. at 526.

Scholl's performance at Thomas' trial indicates that he did not understand applicable Confrontation Clause jurisprudence. He did not object to either the form or content of the proposed redacted confession at the pre-trial conference because he thought that it "complied with the rules of evidence. It complied with *Bruton* . . . I agreed that the redactions were properly made." Dkt. 14-11 at PageID 5998-99.

In reviewing this claim, contrary to Scholl's understanding, the lower courts found unequivocally that the use of Bond's confession at trial was unconstitutional under Supreme Court precedent. Both state courts on post-conviction review acknowledged that "the law regarding redacted confessions under *Bruton* was in place well before Petitioner's trial." PC-Crim. Ct. Op. at 81-83; PC-CCA Op. at 33. Further, Scholl wrongly believed that he was not required to request a limiting instruction, indicating his profound misunderstanding of Supreme Court Confrontation Clause jurisprudence and also basic trial and evidence procedures. *See*, *e.g.*, *United States v. Locklear*, 24 F.3d 641, 646 n.2 (4th Cir.) (noting that defendant waives his right to a limiting instruction if he fails to request one).

The post-conviction courts found that Scholl's decisions not to object to the form and content of Bond's confession were "reasonable under the circumstances." However, it is unquestionable that Scholl's failure to object to the State's improper introduction and use of the Bond confession constituted deficiency and that the Court of Criminal Appeals' determination otherwise was an unreasonable application of clearly established federal law. The Supreme Court has held that counsel's errors should not be excused as "strategy" when they are merely "mistaken beliefs [about the law]." *Kimmelman*, 477 U.S. at 385.

Even though it found that Scholl's failure to request a limiting instruction was deficient, the Court of Criminal Appeals decided that Thomas was not prejudiced by Scholl's failures regarding the use of Bond's confession because the *Bruton* errors were harmless. This finding was founded on the purported fact that "[t]he evidence of Petitioner's guilt, even absent the redacted statement, was overwhelming." PC-CCA Op. at 33.

The Court of Criminal Appeals clearly misapplied the *Strickland* prejudice standard in focusing on weight of the prosecution's other evidence against Thomas.[6] *Strickland* requires consideration of the "totality of the evidence" in determining prejudice, including the evidence that *would* have been provided but for counsel's deficiency. 466 U.S. at 695-96; *see also Sears v. Upton*, 130 S. Ct. 3259, 3265-66 (2010) *cert denied sub nom*, *Sears v Chapman*, - S.Ct. -. 2014 WL 675488 (May 19, 2014) (post-conviction court erred by failing to consider the effect of evidence that would have been presented but for counsel's deficiency).

The Court of Criminal Appeals, in assessing the impact of the improperly redacted Bond confession, unreasonably applied this standard by determining that Jackson's testimony was "overwhelming" evidence of Thomas's guilt. PC-CCA Op. at 33-34. The Court of Criminal Appeals failed to assess how the improper admission of Bond's confession affected the

---

[6] In the Sixth Circuit, the standard laid out by the Supreme Court in *Brecht v. Abrahamson*—*i.e.*, whether an error had a "substantial and injurious effect or influence in determining the jury's verdict," 507 U.S. 619, 632 (1993)—is "always the test" to determine whether a state court's improper finding that a constitutional error was harmless meets the AEDPA standard for the grant of habeas relief. *See Ruelas v. Wolfenbarger*, 580 F.3d 403, 412 (6th Cir. 2009). However, where a habeas court is reviewing a state court's finding that counsel's failure to object to an underlying constitutional error was not prejudicial because the constitutional error was harmless, the habeas court need only conduct the *Strickland* prejudice inquiry to determine whether there was reversible error under AEDPA, as "[t]he prejudice prong of the ineffective assistance analysis subsumes the *Brecht* harmless-error review." *Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009) ("If Hall can show that he was prejudiced by his attorney's failure to object during closing, then he necessarily satisfies *Brecht*"). *Id.*

jury's consideration of the evidence. *See id.* The State relied heavily on Jackson's testimony—and Bond's confession was the only evidence that could corroborate her identification of Thomas on the Walgreens surveillance video. Without this critical corroboration from Bond's confession, there can be little doubt that there is a reasonable probability that at least one juror would have taken a different view of the evidence against Thomas and questioned his guilt. *See Wiggins*, 539 U.S. at 513, 537 (describing the *Strickland* prejudice inquiry as asking whether there is "a reasonable probability that at least *one juror* would have struck a different balance") (emphasis added).

Additionally, there is significant evidence that would—or should—have been presented at trial that otherwise casts doubt on Jackson's credibility, all of which must be considered under *Strickland*. *See Porter v. McCollum*, 558 U.S. 30, 41(2009) ("To assess [the] probability [of a different outcome under *Strickland*], we consider the 'totality of the available . . . evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the [prosecution's] evidence.'" (internal citation omitted)).

It is now known that the prosecution withheld *Brady* material from Thomas about the FBI's payment of Ms. Jackson in connection with her testimony in his federal trial—evidence that absolutely would have been used to impeach her credibility had it been disclosed, and that would have severely damaged her credibility in the eyes of the jury. Furthermore, if the jury had *also* known about the Bond letter and its recantation of Bond's implication of Thomas, *and* if Scholl had properly presented additional evidence of Jackson's relationship with Bobby Jackson (the individual that Bond implicated in the Walgreens robbery and shooting) and his involvement in the Southbrook Mall robbery (an incident similar to the Walgreens robbery

and shooting), there is no doubt at least one juror would have taken a different view of evidence against Thomas.

Finally, in conducting its prejudice analysis, the Court of Criminal Appeals also failed to consider the State's deeply prejudicial use of Bond's confession during its summation, when the prosecutor repeatedly linked Thomas to the "other person" referenced in Bond's confession. *See*, *e.g.*, *United States v. Schwartz*, 541 F.3d 1331, 1353 (11th Cir. 2008) (finding  that where the prosecutor made a connection between a *Bruton* violation and defendant's commission of crimes during his closing argument, "the inference [of guilt] was made inevitable—and therefore 'devastating'").

In sum, the undisputed facts show that the Tennessee Court of Criminal Appeals' decision was contrary to, and an unreasonable application of, clearly established Supreme Court authority. When the "totality of the evidence" in Thomas's case is properly considered—as *Strickland* requires—it is clear that Scholl's errors regarding the State's unconstitutional introduction and use of Bond's confession deeply prejudiced Thomas's defense.

### 4.    Additional Instances Of Ineffective Assistance Of Counsel

In his Petition, Thomas raised three additional theories as to why his counsel was ineffective. Pet. ¶¶ 261-85.  The Respondent's sole arguments in response to these claims  that are procedurally defaulted because they were not presented to the Tennessee Court of Criminal Appeals.  As explained in Petitioner's Reply in Support of the Petition for *Habeaus Corpus* ("Reply"), on the contrary, Thomas has exhausted each ineffective assistance of counsel claim in the Tennessee state courts and they were properly included in the petition for *habeas* relief.

Reply at 19-21. Additionally, each instance involved another unreasonable application of relevant Supreme Court precedent.

      **a.**      **The State Court Erred In Finding That Brooks's Failure to Present Any Confrontation Clause Issues On Thomas's Direct Appeal Was Harmless Error**

The state court's determination that Robert Brooks' deficient performance during Thomas' appellate proceedings was harmless is an unreasonable application of relevant Supreme Court precedent. Brooks clearly failed to raise any of the many Confrontation Clause violations on direct appeal relating to the State's unconstitutional introduction and use of Bond's confession as evidence against Thomas. This failure was prejudicial to Thomas because these were meritorious issues and, had Brooks raised them, there is more than a reasonable probability that the outcome of the appeal would have been different.

      **b.**      **Scholl's Failure To Object To The Trial Court's Unconstitutional Instruction On Causation Was Deficient Performance That Prejudiced Thomas**

Tennessee law requires that a the court instruct a criminal jury that the State must prove proximate cause: "Before the defendant can be convicted of any degree of homicide, the State must have proven beyond a reasonable doubt that the death of the deceased was proximately caused by the criminal conduct of the defendant." 7 Tenn. Prac. Pattern Jury Instr. T.P. I.-Crim. 42.14 (2011); *see also State v. Farner*, 66 S.W.3d 188, 206 (Tenn. 2001) ("causation is an element of every homicide offense, and the jury should so be instructed"). However, the trial court failed to instruct Thomas's jury that the State *must* prove proximate cause. Despite the clear unconstitutionality of the trial court's instruction on proximate causation, Scholl failed to object to it in any way. *See* Dkt. 13-1 at PageID 2818-19 (State Trial Tr. at 1556-57). Because there is no reason to believe that Scholl's failure to object was a

strategic decision, there can be no doubt that his failure constituted deficient performance, contrary to the state courts' findings. *See Walker v. Morrow*, 458 Fed. App's 475, 484 (6th Cir. 2012) (finding counsel's failure to object to an improper jury instruction constituted deficiency, where counsel's failure to object was not based on any strategic consideration and rendered an important defense "meaningless").

Further, there is a reasonable probability that counsel's objection to the trial court's unconstitutional instruction would have changed the outcome of Thomas's trial. As a result of Scholl's failure to object, the jury considered the element of proximate causation, one of the central issues in the case, using improper standards that destroyed Thomas' causation defense by shifting the burden of proof to the defense. *See Walker*, 458 Fed. App's at 484-85 counsel's failure to object to a jury instruction that incorrectly prevented the jury from considering "strong" evidence in favor of the defendant "for any purpose for which it was properly presented" was prejudicial under *Strickland* because it "prohibit[ed] a certain use of [the evidence]—the use most probative of [the defendant's] innocence").

### c. Scholl's Failure To Present Evidence That Bobby Jackson Committed The Walgreens Robbery With Anthony Bond Constituted Deficient Performance Under Clearly Established Supreme Court Precedent

Scholl's "primary" defense at trial was that "Anthony Bond was involved in the Walgreens robbery with another individual . . . Bobby Jackson." Dkt. 14-11 at PageID 6006. However, despite the fact that there was a significant evidence supporting this theory, Scholl failed to present any evidence in support of it. As such, the Court of Criminal Appeals' decision that Scholl's failure to mount an adequate defense that Bobby Jackson was the true perpetrator of the Walgreens robbery did not constitute deficient performance was contrary to, and an unreasonable application of, *Strickland*.

**5.      The Cumulative Effect of Counsel's Errors Constitutes Ineffective Assistance of Counsel**

In his Petition, Thomas argued that the cumulative effect of counsel's errors constituted ineffective assistance of counsel.  Pet. ¶¶ 286-89.  In his Motion, Respondent does not address this argument.  The Court of Criminal Appeals denied Thomas relief based on the cumulative effect of counsel's errors during his state court proceedings because "Petitioner's attorneys did not afford him ineffective assistance of counsel based on any single alleged error or the cumulative effect thereof."  PC CCA Op. at 49.  This finding is an unreasonable application of the Supreme Court's *Strickland* jurisprudence, which makes consideration of the cumulative effect of counsels' error mandatory.  *See Williams*, 529 U.S. at 399 (state court properly considered the "entire post- conviction record, viewed as a whole and cumulative of mitigation evidence presented originally" in finding ineffective assistance); *Dobbs v. Zant*, 506 U.S. 357, 359 n.* (1993) (combined errors of counsel could be considered when conducting an ineffective assistance of counsel claim); *United States v. Cronic*, 466 U.S. 648, 657 n.20 (1984) ("counsel's overall representation of respondent, as opposed to any specific error or omission" may be the basis of an ineffective assistance of counsel claim).

As detailed above, the state courts clearly misapplied Supreme Court ineffective assistance of counsel jurisprudence unreasonably on every point that Thomas raised in his state court proceedings.  The mistakes that should have been recognized by the state courts, viewed in their totality against the dearth of evidence linking Thomas to Day's death, "alter[ed] the entire evidentiary picture" and, ultimately, the outcome of the trial itself.  *Strickland*, 466 U.S. at 696.  The state courts' failures to recognize counsel's repeated ineffective assistance caused Thomas to face a death sentence.  The Respondent has not demonstrated that it is entitled to a judgment as a matter of law on this claim.

**D.      Claim No. 5:  The Jury Should Have Been Instructed On Lesser Included Offenses Of Felony Murder**

In his Motion, Respondent argues that Thomas's claim that the trial court should have instructed the jury as to lesser included offenses of felony murder must fail because Thomas presented the theory under a state-law claim in state court and because the state court did not violate clearly-established federal law.  However, both of these arguments must fail.

In this Circuit—and in the State of Tennessee—trial courts hearing a capital case *must* instruct the jury as to any lesser included offenses that are raised by the evidence.  *Beck v. Alabama*, 447 U.S. 625, 642-43 (1980); *Hopkins v. Reeves*, 524 U.S. 88, 90 (1998); *Bowling v. Parker*, 344 F.3d 487, 500 (6th Cir. 2003); *State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999).  At Thomas's trial, the trial court failed to instruct the jury on three lesser included offenses to the main charge of felony murder.  Dkt. 13-1 at PageID 2820-25.  Pursuant to the test of *Burns*, any offense is lesser-included if: (a) all of

> its statutory elements are included within the statutory elements of the offense charged; or (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing (1) a different mental state indicating a lesser kind of culpability: and/or (2) a less serious harm or risk of harm to the same person, property or public interest; or (c) it consists of (I) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

6 S.W.3d at 466-67.  Under this standard, the trial court was obligated to charge the jury as to second degree murder, reckless homicide, and criminally negligent homicide, all of which require the same mental state as felony murder.  *See, e.g., State v. Ely*, 48 S.W.3d 710, 721-22 (Tenn. 2002).  Thomas appealed his conviction, in part, on the claim that the trial court did not

29

instruct the jury as to the three lesser included offenses of second degree murder, reckless homicide, and criminally negligent homicide.

The Respondent now argues, however, that Thomas has failed to exhaust his state court remedy with respect to the lesser-included offense claim merely due to the fact that before the Court of Criminal Appeals, Thomas framed the issue with respect to state law, not federal law.[7] This is simply not the case. The precedent cited by Thomas for the proposition that lesser-included offense instructions must be given to the jury is itself predicated upon *Beck*, as is Tennessee's case law in this area, generally. *See, e.g., Burns*, 6 S.W.3d at 464; *Ely*, 48 S.W.3d at 726. Thomas's claim based on the trial court's failure to instruct the jury properly as to lesser included offenses under *Beck*—and thus federal law—was therefore fairly presented to the state courts. The Sixth Circuit has enumerated "four actions a defendant can take which are significant to the determination whether a claim has been 'fairly presented': (1) reliance upon federal cases employing constitutional analysis; (2) *reliance upon state cases employing federal constitutional analysis*; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (quoting *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987) (emphasis added)). Here, Thomas's counsel relied upon Tennessee case law that directly considered federal case law and Constitutional analysis. Dkt. 13-19 at PageID 3894; *Burns*, 6 S.W.3d at 464 (Stating that "[a]n understanding of the development of the law related to lesser-included offense instructions

---

[7] Additionally, it is important to note that Thomas' counsel did seek to address the lesser-included offense claim with respect to both Tennessee case law and the Supreme Court's decision in *Beck*, however, the Court of Criminal Appeals rejected Thomas' initial appellate brief, requiring counsel to excise 19 pages and remove citation to *Beck*. *See* Dkt. 13-18 at PageID 3765-66.

is necessary to our analysis of this issue" before analyzing and citing to *Beck*); *Ely*, 48 S.W. 3d at 725-26 (acknowledging that Tennessee's law on lesser included offenses grew out of the Supreme Court's rulings in *Shcad v. Arizona*, 501 U.S. 624 (1991) and *Beck*).

The State's citation to *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) is inapposite. In *Wong*, the Sixth Circuit found that an ineffective assistance of counsel claim based upon counsel's failure to investigate was not expressly presented in the state courts, and was sufficiently separate and distinct from the petitioner's ineffective assistance of counsel claim based upon counsel's decision to forgo an insanity defense. *Id.* at 321-22. Here, however, Thomas's claim that the trial court failed to properly instruct the jury on lesser included offenses is *identical* under Tennessee state law and federal law.

In addition, the weight of federal case law from other circuits suggests that a petitioner has fairly presented his federal claims to the state courts if he relies upon state court cases that employ federal law or Constitutional analysis of similar factual scenarios. *Scarpa v. Dubois*, 38 F.3d 1, 6-7 (1st Cir. 1994) (petitioner fairly presented claim to state courts by referring to "ineffective assistance of counsel" and citing trio of state court cases that evaluate the effectiveness of an attorney's performance in terms reminiscent of the federal constitutional standards); *see also Hawkins v. West,* 706 F.2d 437, 439–440 (2d Cir. 1983); *Lesko v. Owens,* 881 F.2d 44, 50 (3d Cir. 1989); *West v. Wright,* 931 F.2d 262, 266 (4th Cir. 1991), *rev'd on other grounds*, 505 U.S. 277 (1992); *Verdin v. O'Leary*, 972 F.2d 1467, 1478, 1481 (7th Cir. 1992); *Rust v. Hopkins*, 984 F.2d 1486, 1491 (8th Cir. 1993); *Bowser v. Boggs,* 20 F.3d 1060, 1063 (10th Cir.); *Nichols v. Sullivan,* 867 F.2d 1250, 1252–1253 (10th Cir.); *Hutchins v. Wainwright,* 715 F.2d 512, 518–519 (11th Cir. 1983).

There is no question that the standards presented by *Beck* are identical to those underpinning Tennessee's state law jurisprudence on failure to instruct on lesser included offenses. Because the Tennessee standard—and corresponding case law—relies directly upon the federal mandate that trial courts must instruct juries on lesser included offenses, the state courts had a "fair opportunity" to render a decision on this claim under both state and federal law.

In addition to this claim having been properly preserved below, the State is not entitled to summary judgment on this claim because the appellate courts' finding that the failure to instruct on these offenses was harmless, as well as the trial court's underlying decision not to instruct the jury as to lesser-included offenses, was contrary to, or an unreasonable application of, federal law and had a substantial and injurious effect on the verdict in this case.

It is clearly established under federal law that the jury must be instructed on lesser included offenses in a capital case when there is evidence to support such an instruction, and failure to give such instructions when there is evidence to support them constitutes constitutional error. *See Beck*, 447 U.S. at 638; *Hopper v. Evans*, 456 U.S. 605, 611 (1982). Because the trial court failed to give such instructions, and the appellate courts found that determination to be harmless, the state courts' actions were contrary to, and an unreasonable application of, clearly established Supreme Court precedent. Moreover, because the evidence presented at trial could have permitted the jury to reasonably convict Thomas of a lesser included offense of felony murder, including an offense that did not carry a possible death sentence, the trial court's failure to instruct the jury on lesser included offenses "had [a] substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrhamson*, 507 U.S. 619,  623 (1993); *see also Beck*, 447 U.S at 637 (noting that "failure to give the jury the 'third option' of

32

convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction," and that "[s]uch a risk cannot be tolerated in a case in which the defendant's life is at stake."). Thus, the State is not entitled to judgment as a matter of law on these claims.

### E.      Claim No. 6:  The Court Erred In Allowing The Prosecutor To Repeatedly Argue That Thomas And Bond Were "Greed" And "Evil"

In addition to raising this issue through Thomas's ineffective assistance of counsel claim at all levels of the Tennessee state courts, Thomas's appellate counsel appealed the prosecutor's repeated naming of  Thomas and his co-defendant as " Greed" and " Evil" during opening and closing arguments as part of Thomas's direct appeal to the Court of Criminal Appeals of Tennessee. Dkt. 13-19 at PageID 3895-96. The Court of Criminal Appeals thus had a full and fair opportunity to review this ground for appeal, which it denied.[8] Dkt. 13-23 at PageID 4143-45. The clearly improper use of "Greed" and "Evil" by the prosecutor in Thomas's trial was thus fully and fairly presented to the courts of the State of Tennessee for review and is properly before this Court on a petition for a writ of *habeas corpus*. Tenn. Sup. Ct. R. 39.

Contrary to the Respondent's assertions, the record demonstrates that, in violation of federal law, the prosecutor repeatedly referred to Thomas and Bond as "Greed" and "Evil" during her opening and closing arguments. In reviewing a claim for *habeas* relief based on prosecutorial misconduct in a closing argument, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The United States Supreme Court acknowledges that a prosecutor's words carry great weight with the jury, and that

---

[8] The Court of Criminal Appeals further addressed this claim as part of Thomas' application for post-conviction relief.  Dkt. 14-24 at PageID 7053.

if pronounced and persistent, improper suggestions and insinuations can have a "probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Berger v. United States*, 295 U.S. 78, 88-89 (1935).

There can be no doubt here that the prosecutor's words were pronounced and persistent, such that there was a probable effect on the jury. Contrary to federal law, the State referred to Bond and Thomas as "Greed" and "Evil" a total of 21 times during its opening and closing statements of the guilt phase of Thomas's trial without objection by defense counsel or the issuance of a curative instruction by the court. Indeed, both the Tennessee Supreme Court and the Court of Criminal Appeals correctly acknowledged that the prosecutor's repeated inflammatory characterizations of Thomas and Bond were improper. *See State of Tennessee v. Thomas*, 158 S.W.3d 361, 373 (Tenn. 2005); *State of Tennessee v.Thomas*, No. W2001-02701-CCA-R3-DD, 2004 WL 370297, at *46 ( Tenn. Crim. App. Feb. 27, 2004). However, the appellate courts incorrectly and unreasonably concluded that the prosecutor's words, though "unseemly" and "improper," were harmless. The appellate courts' determination that the prosecutor's improper comments were harmless, and the trial court's allowance of these statements without a curative instruction, is an unreasonable application of established federal law because those statements "infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181; *see also Cauthern v. Colson*, 736 F.3d 465, (6th Cir. 2013) (granting writ of *habeas corpus* on the basis of prosecutorial misconduct in light of prosecution's inflammatory statements made during summation, including that the Petitioner was "the evil one").

The prosecutor's highly inflammatory and unnecessary argument that Thomas and Bond were "Greed" and "Evil" clearly "had [a] substantial and injurious effect or influence in

determining the jury's verdict" and cannot reasonably be deemed harmless. *Brecht*, 507 U.S. at 623; *see also Ruelas v. Wolfenbarger,* , 580 F.3d  403, 412 (6th Cir. 2009).  Without these inflammatory epithets, there would have been a reasonable probability that at least one juror would have been able to impartially weigh the evidence at trial.  Thus, the Respondent is not entitled to judgment as a matter of law on this claim.

    **F.**    **Claim No. 7:  The Trial Court's Erroneous Jury Instruction Relieved The State Of Proving Proximate Causation And Would Result In An Arbitrary And Capricious Execution**

The Respondent argues that Thomas's claim that the trial court erred in not instructing the jury that the State bore the burden of proving causation is procedurally defaulted.  However, this This claim was properly brought before the Court of Criminal Appeals of Tennessee as part of Thomas's petition for rehearing of his appeal of the denial of post-conviction relief (Dkt 4-24 at PageID 7097-98), and as part of Thomas's request for permission to appeal the denial of post-conviction relief to the Tennessee Supreme Court (Dkt. 14-27 at PageID 7206-07).  Thomas has exhausted this claim before the courts of the State of Tennessee and it should properly be considered as part of Thomas's *habeas* petition.  Tenn. Sup. Ct. R. 39.

Supreme Court precedent clearly requires that the jury must be instructed that the State is required to prove every element of a criminal charge.  *See Francis v. Franklin*, 471 U.S. 307, 313 (1985) (states may not "us[e] evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime").  However, as discussed above, the trial court's jury instruction on proximate causation unconstitutionally shifted the burden of proof on causation to the defense by failing to inform the jury that it was the state's burden to prove proximate causation.  The trial court's jury instruction thus was contrary to clearly established federal law.

35

The unconstitutional instruction obviously had a substantial and injurious effect or influence on the jury's verdict.  Specifically, by shifting the burden of proof to the defense instead of putting it squarely on the prosecution, the instruction foreclosed the possibility that at least one juror could have concluded that Thomas's causation defense created enough uncertainty as to the cause of Day's death that the State had not met its burden of proving its case beyond a reasonable doubt.  The execution of a defendant convicted based on such a faulty instruction would constitute an arbitrary and capricious death sentence.  *See Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (the elements of a crime not only define the criminal offense but, in a capital case, also provide standards that ensure that the jury's "discretion [is] suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").  Thus, the Respondent is not entitled to judgment as a matter of law on this claim.

> **G.    Claim No. 8:  The Court Improperly Struck For Cause A Potential Juror Who Expressed Concerns About The Death Penalty, But Who Would Not Have Been Substantially Impaired In Performing His Duties**

The Respondent argues that the state court did not violate clearly-established federal law by denying Thomas's claim that the trial court erred in excluding a potential juror who stated concerns about his ability to apply the death penalty.  However, it is clearly established Supreme Court law that the proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).  Contrary to this standard, the undisputed facts demonstrate that the trial court improperly struck for cause a potential juror who expressed misgivings about the

death penalty, but also explained that his misgivings would not substantially impair him in performing his duties as a juror required to consider the imposition of the death penalty.

During the trial court *voir dire* proceedings, a prospective juror, G.P.,[9] admitted that imposing the death penalty would be difficult for him due to the permanency of the punishment and his concerns about the reliability of witness testimony.  However, he never stated that he could not follow the law with regard to the imposition of the death penalty or that his personal beliefs would prevent him from following the law as it then stood in Tennessee.  *See* Dkt. 12-14 at PageID 1195-1200 (State Trial Tr. at 199-204).  In fact, in response to questions from both defense counsel and the trial court, G.P. affirmatively stated that there were some circumstances under which he would be able to impose the death penalty, including, but not limited to, when he had witnessed the crime or heard a defendant's confession.  *Id.* at 201-02.  As the prospective juror explained to the court, "That's the only two [situations] that I can think of ***right now***." *Id.* at PageID 1197 (State Trial Tr. at 201) (emphasis added).

Thus, the prospective juror did not foreclose other situations in which he would sentence a defendant to death and his comments do not reflect an unwillingness to apply the law as it stands.  Rather, G.P. articulated a general and well-founded concern over whether the State could bear the evidentiary burden of proving Thomas's guilt and death-eligibility beyond a reasonable doubt and his intention to evaluate the credibility of witnesses—a duty squarely within the province of the jury—with a careful eye.

These comments do not demonstrate that G.P. would have been substantially impaired in performing his duties as a juror and the trial court's decision to allow G.P. to be challenged for

---

[9] "G.P." refers to the prospective juror described on pages 199-204 of the state trial transcript. *See* Dkt. 12-14 at PageID 1195-1200.  Thomas refers to the prospective juror by these initials in an effort to respect his privacy in light of the electronic filing of this motion.

cause on this basis was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.  Moreover, allowing G.P. to be challenged for cause "had [a] substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623, because G.P. may have brought different views to jury deliberations which could have resulted in a sentence other than death.  Thus, the Respondent is not entitled to judgment as a matter of law on this claim.

## H. Claim No. 9:  The State Should Not Have Tried Thomas Capitally For A Crime For Which He Had Already Been Tried And Convicted In Federal Court

The Respondent argues that Thomas's claim that his dual prosecutions in state and federal courts relating to the same incident violate Double Jeopardy must fail because prosecutions by distinct sovereign entities do not invoke Double Jeopardy concerns.  However, it is clear that contrary to federal law, the State tried Thomas capitally for a crime for which he had already been tried and convicted in federal court, and because that error had a substantial and injurious effect on the jury's verdict.   The adjudication of this claim in the state courts resulted in a decision that was contrary to, and involved an unreasonable application of the Double Jeopardy Clause of the Fifth and Fourteenth Amendments.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution states that "[n]o person ... shall ... be subject for the same offense to be twice put in jeopardy of life or limb...."   The clause was incorporated against the states through the enactment of the Fourteenth Amendment.  *Benton v. Maryland*, 395 U.S. 784, 793 (1969).  Prior to being tried by the State of Tennessee for felony murder for his alleged role in the Walgreens robbery, Thomas was tried and convicted in federal court for armed robbery based on the same alleged acts.  Thomas was then tried and convicted in state court for essentially the same crime for which he

was already being punished, which violated his Fifth and Fourteenth Amendment rights to be free from double jeopardy.

The Respondent argues in his Motion that prosecutions by distinct sovereign entities do not have double jeopardy implications.  However, this fails to address the point raised in the Petition that the legal fiction of the dual-sovereignty doctrine is woefully outdated, as it predates both recent increases in cooperation between federal and state law enforcement and the passage of numerous federal laws addressing criminal issues historically left to the states.  Both of Thomas's prosecutions resulted from the joint investigative efforts of state and federal law enforcement agencies, which had joined forces through the Safe Streets Task Force to investigate criminal activity in Memphis.  Furthermore, Thomas's state prosecution was "in essential fact another federal prosecution." *Bartkus v. Illinois*, 359 U.S. 121, 124 (1959).  In federal court, the government presented evidence that Thomas allegedly robbed and shot Day in an effort to prove Counts I and II of the federal indictment: obstruction of interstate commerce through the use of robbery under 18 U.S.C. § 1951 and use of a firearm to commit a crime of violence under 18 U.S.C. § 924(c). To prove felony murder, the State put on the same evidence that Thomas allegedly robbed and shot Day. The State necessarily had to re-prosecute the robbery in order to prove the underlying felony in the felony murder charge.  As a result, the evidence admitted at the federal and state trials overlapped significantly.

Prosecuting and convicting Thomas in both federal and state court also violated the guarantees against Double Jeopardy contained in the International Covenant on Civil and Political Rights ("ICCPR"), which the United States ratified on September 8, 1992.  Article XIV, § 7 of the ICCPR, which was ratified by the United States on September 8, 1992, provides guarantees against Double Jeopardy within a single country. *See* ICCPR art. XIV, § 7, Dec. 16,

1966, 999 U.N.T.S. 171. Under the auspices of this treaty, the state/federal dual sovereignty rule is not recognized. Federal and state judges are bound by the terms of treaties to which the United States is a party. Accordingly, Thomas's state prosecution violated the protections he is afforded under the ICCPR.

Because Thomas's state prosecution was contrary to, or involved an unreasonable application of, federal law, and because that prosecution had a substantial and injurious effect or influence in determining the jury's verdict (*i.e.*, there would have been no verdict and death sentence if he were not prosecuted at the state level), the Respondent is not entitled to judgment as a matter of law on this claim.

I.   **Claims No. 10 and 11:  The Death Penalty Violates Treaties Ratified By The United States And Is Inconsistent With International Laws And Norms And The Death Penalty System Is So Broken And Fraught With Errors That The Imposition Of Death In This Case Violates The Constitution**

The Respondent argues in his Motion that Petitioner's challenges to the death penalty have been repeatedly rejected by other courts. However, this argument fails to substantively address the point raised in the Petition that the use of the death penalty in Tennessee conflicts with the denouncement and proscription of the death penalty in treaties signed and ratified by the United States, as well as in international laws and norms that reflect modern mores of civility and decency with regard to the imposition of sanctions for criminal activity. Because the death penalty in Tennessee is contrary to, or involved an unreasonable application of, federal law, and because the availability of the death penalty had a substantial and injurious effect or influence in determining the jury's verdict (*i.e.*, there would have been no death sentence if Tennessee's law comported with international laws and norms), the Respondent is not entitled to judgment as a matter of law on these claims.

**IV.     CONCLUSION**

As a result of the foregoing, Petitioner, Andrew Thomas, respectfully requests that this

Court deny the Warden's Motion for Summary Judgment in its entirety.


Dated:  June 26, 2014

Respectfully submitted,

/s/Kevin Wallace

Kevin Wallace
Elizabeth A. Cate
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Ph: 212-294-6700
Fax: 212-294-4700
kwallace@winston.com
ecate@winston.com

Robert L. Hutton
GLANKLER BROWN, PLLC
6000 Poplar Ave.
Suite 400
Memphis, TN 38119
Ph: 901-525-1322
Fax: 901-525-2389
rhutton@glankler.com

**CERTIFICATE OF SERVICE**

I, Kevin Wallace, an attorney, hereby certify that on June 26, 2014, I caused to be
served true copies of **PETITIONER ANDREW THOMAS'S RESPONSE TO THE
WARDEN'S MOTION FOR SUMMARY JUDGMENT** by filing such document through the
Court's Electronic Case Filing System, which will send notification of such filing to all parties of
record in this case.

/s/ Kevin Wallace
Kevin Wallace
Attorney for Andrew Thomas